## UNITED STATES v. BIANCO.

### No. 10365.

United States Court of Appeals
Third Circuit.

Argued March 6, 1951.

Decided May 4, 1951.

Rehearing Denied June 21, 1951.

Irwin A. Swiss, Asst. U. S. Atty., Pittsburgh, Pa. (Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., on the brief), for appellant.

Premo J. Columbus, Pittsburgh, Pa., for appellee.

Before MARIS, McLAUGHLIN and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The appellee, Joseph Bianco, an interstate traveler, was arrested on his arrival at Pittsburgh, Pennsylvania by William Drew, a special agent of the Federal Bureau of Investigation, and charged with the interstate transmission of lottery materials.[1] Certain lottery materials were taken from his person and from his hand luggage. Prior to the return of an indictment against him, he filed the petition now before us for the suppression of these materials as evidence against him, and for their return. The petition was granted by the United States District Court for the Western District of Pennsylvania. The government has appealed.[2] The issue before us is whether the arrest of Bianco was lawful under Section 3052 of the Criminal Code, 18 U.S.C. § 3052 (Supp. 1950), 62 Stat. 817 (1948). If it was, the seizure was also lawful, and the materials seized can be used at trial under the indictment which has since been returned.[3]

Section 3052 provides that: "* * * agents of the Federal Bureau of Investiga-

[1]. 18 U.S.C. § 1301 (Supp.1950), 62 Stat. 762 (1948).

[2]. As the petition to suppress and return the seized materials was filed as a separate proceeding before the return of the indictment, the order of the court below is appealable. In re Sana Laboratories, 3 Cir., 1940, 115 F.2d 717, certiorari denied, Sana Laboratories v. United States, 1941, 312 U.S. 688, 61 S.Ct. 615, 85 L.Ed. 1125; cf. United States v. Rosenwasser, 9 Cir., 1944, 145 F.2d 1015, 156 A.L.R. 1200; United States v. Haberkorn, 2 Cir., 1945, 149 F.2d 720.

[3]. "When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution." Carroll v. United States, 1925, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543; see also, Application of Fried, D.C., S.D.N.Y.1946, 68 F.Supp. 961, 963.

tion * * * may * * * make arrests withι ut warrant for felonies cognizable under tne laws of the United States, where the person making the arrest has reasonable grounds to believe that the person arrested is guilty of such felony and there is a likelihood of his escaping before a warrant can be obtained for his arrest."

The statute, in terms, makes crucial the rationally founded belief of "the person making the arrest". Therefore, we consider first ιhe information known to Drew, the arresting officer. Drew's knowledge was simply this. He had received a call in the evening of March 24, 1950 from H. B. Wood, a special agent in the Baltimore office of the Bureau. He was told that Maurice duBois, another special agent, working in Baltimore, "had received reliable information that [Joseph] Bianco would take the 8:25 plane [from Baltimore to Pittsburgh], that he had lottery materials with him, and that he believed that he was identical with the Joseph Bianco who had previously been involved with lottery activities in Pittsburgh". Apparently he also was told that Bianco would be followed to Pittsburgh by an agent named McKinnell, and that McKinnell would identify himself and Bianco on the plane's arrival.

After preliminary identification by McKinnell, events at the Pittsburgh airport developed as follows, according to Drew: "* * * we followed Mr. Bianco through the Allegheny County Airport terminal and, as any passenger would, he went to the front steps to await the arrival of his baggage * * * [after] five or six minutes waiting * * * Mr. Bianco took off on foot around the circle where you park cars. On noticing this, Agent Hughes and I followed him, where we observed him getting into a * * * sedan. As the key was on, we felt that he was going to make an immediate departure. I immediately identified myself to Mr. Bianco, told him that he ·was under arrest and that we were going to take him to the Pittsburgh office of the F.B.I. * * *"

Except for his own independent recollection of Bianco's earlier involvement in the 1942 lottery investigations, this is all the information that Drew had. It is obvious that the core of Drew's information was simply the summary assertion of Wood, the Baltimore agent, that duBois, another Baltimore agent, "had received reliable information that Bianco would take the 8:25 plane [and] that he had lottery materials with him * * *." Wood offered no information as to why they believed this, and Drew requested none.

If we retrace the record, and Bianco, to Baltimore, however, we find a much fuller panoply of fact to explain why Joseph Bianco was arrested as he was. Sometime on the morning of March 24, 1950, Bianco came out of a grocery store in Baltimore in the company of two other men. At the time, the store was being watched by FBI agent Maurice duBois who knew that the store was a center for the distribution of lottery materials, and that Bianco's two companions were distributors of such materials. Therefore, when the three men got into a car and drove off, duBois followed them. According to his testimony, "They proceeded to the Baltimore Municipal Airport, and I observed Mr. Bianco go to the Capital Airlines counter and make some inquiries and thereafter he had some conversation with the two gentlemen that were with him. He got a large tan leather suitcase from the car which had brought him down and proceeded to check it in a locked locker". Bianco and his companions then left the airport. DuBois proceeded to make inquiries of the airline clerk, and discovered Bianco's identity, the fact that he had a reservation for Pittsburgh at eight-thirty that evening, that he had attempted to get an earlier plane out of Baltimore but was unable to do so because all the space was booked, and that he had arrived by plane from Pittsburgh about ten-thirty that morning.

DuBois returned to the neighborhood of the store and was told by informers, believed by him from past experience to be reliable, that the large suitcase which Bianco had checked contained lottery materials. He also recalled that the name of Joseph Bianco was familiar to him as that of a person who was involved in an extensive investigation of lottery activities in Pittsburgh from 1941 to 1943.

DuBois then called his immediate superior in the Baltimore office of the Bureau, Special Agent H. B. Wood, and reported "that I suspected Mr. Bianco was taking lottery material back to Pittsburgh on the flight at eight-thirty p.m. and I felt it would be desirable to have him surveilled from Baltimore to Pittsburgh". Pursuant to this suggestion, Agent McKinnell was sent by Wood to the airport to replace duBois and undertake the job.

DuBois' call to Wood was made at six-thirty p.m. At eight p.m. Wood called Pittsburgh and gave Drew, the arresting agent, the information we have earlier set out. From this, and the conduct of Bianco at the airport, the arrest resulted.

On these facts, we must determine whether at the time of arrest Drew had reasonable ground to believe that Bianco was guilty of the interstate transmission of lottery materials. And we must further determine whether there was a likelihood of his escape before a warrant for his arrest could be obtained. But a preliminary question must be answered first: whether in determining the existence of reasonable belief we are restricted to what was known to the arresting officer, Drew, or whether we may consider what was known to the agent duBois.

■ We have pointed out that the statute authorizing arrest without a warrant by Bureau agents refers to the grounds of belief of "the person making the arrest". The size and character of the Federal Bureau of Investigation however are alone enough to suggest that it must have been supposed that agents of the Bureau would have to rely on the summary conclusions of their fellow-agents. To require full inter-office report in a large organization that must act quickly would plainly hamstring its functioning. Moreover, the legislative record of Section 3052 [4] reveals that its principal function was to facilitate the ability of agents "to make arrests in emergency situations", that is where quick action was essential. Testimony of Attorney General before House Committee on the Judiciary, quoted in House Report No. 1824, 73rd Cong.2nd Sess. (1934); cf. United States v. Heitner, 2 Cir., 1945, 149 F.2d 105, certiorari denied sub nom. Cryne v. United States, 1945, 326 U.S. 727, 66 S.Ct. 33, 90 L. Ed. 432.

■ We hold that the arrest is not invalidated because detailed information as to its rational basis known to the Baltimore agent duBois was not communicated to the arresting agent Drew. But neither does the summary character of the disclosure between the agents place the full substance of the underlying information beyond our scrutiny or its adequacy to support arrest beyond adjudication. To rule otherwise would raise constitutional questions which need not now concern us. Cf. Grau v. United States, 1932, 287 U.S. 124, 53 S.Ct. 38, 77 L.Ed. 212; Nathanson v. United States, 1933, 290 U.S. 41, 54 S.Ct. 11, 78, L. Ed. 159.

■ The agent who relies on the summary assertions of his coagent can acquire therefrom no greater authority than could have been exercised by the coagent had he been in the arresting agent's position. A telephone message cannot immunize irresponsible investigation. This construction of the statute comports fully, we think, with an original legislative request which sought only minimally necessary, but effective, powers. See Testimony of Attorney General, supra. It imports a reading of the language chosen by the Congress in the light of elementary facts about the structure of the Federal Bureau of Investigation presumptively known to the Congress.

We reach then the question on the merits, whether on all the facts outlined above, it was reasonable to suppose that Joseph Bianco was guilty of having transported lottery materials across state lines.

We review some of the facts which seem to us to have made duBois' conclusion reasonable. Bianco was first seen by duBois emerging from a grocery store with two other men. DuBois, who had been assigned

---

4. Section 3052 is derived from 5 U.S.C. § 300a, 48 Stat. 1008 (1934). Its language is, for our purposes, substantially the same as that of the present provision. The legislative history to which we refer is that of the earlier act.

to investigation of lottery activities for some time knew from past experience that this grocery store was a center for distribution of lottery materials. He had observed the very men who were Bianco's companions, and other men come regularly to this store and take materials away. He had observed their operations after they left the store, and knew them to be distributing lottery materials to various locations in Baltimore. Apparently, they did this regularly on Friday mornings; and March 24, 1950 was a Friday morning. He saw Bianco in the company of such men. He saw them go to the airport and remove a large suitcase from their car. He determined that Bianco had only arrived in Baltimore that morning, and that he was making arrangements to leave as quickly as possible. The use of so large a case for so short a trip was extraordinary. DuBois checked with informers. They told him that one of the observed companions had transferred lottery materials to Bianco. They were, according to his testimony, reliable; and he had reason to suppose that they were speaking from first hand knowledge.

It is true, as the court below observed, that each occurrence observed by duBois was consistent with Bianco's innocence. But the general constitutional standard [5] and the particular statutory standard here, which we do not regard as different, require only that there be reasonable belief of guilt. This is not so high a standard as to preclude arrest where an innocent construction of the acts of the defendant is possible.

The investigating agent is not required to separate particular facts from the context of the case or to discover their significance alone. For they are not alone, and the reasonable mind does not evaluate them alone. The statements of reliable informers that Bianco was carrying lottery materials in his bag, supplemented his observed association at the same time with two known lottery distributors. Once it was established that Bianco had arrived at

ten-thirty in the morning and was planning to return the same day, his large suitcase fitted in with what the informers reported. Of course the suitcase, and the fact that Bianco was seen at a lottery distributing center and the fact that he was known to have had earlier lottery associations were in themselves consistent with innocence. But the entire picture of which they were a part was not. It was the picture of a man who came to Baltimore to get lottery materials, obtained them, and was taking them back to Pittsburgh.

We think this analysis reveals also why the court below was wrong in disregarding the information obtained from the informers. The court stated: "I can give little weight to the hearsay. That the information proved to be correct cannot be considered. The court is not advised by duBois of the character of the two informants or why he believed them to be reliable". [94 F.Supp. 244.] It is true that duBois testified merely that he found the informers reliable on the basis of prior dealings with them. We agree that this summary evaluation might well have been sharpened to substantiate the conclusion more convincingly, without however encroaching on holdings that the government cannot normally be compelled to disclose the names of informers. Cf. Scher v. United States, 1938, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151. We agree also that it is not important that the information proved to be correct. Nonetheless, we think that the informers' revelations dovetailed in such a way with the information already available to duBois as to make it reasonable for him to be influenced by their statements. If this hearsay alone supported the arrest, we would not disturb the conclusion of the district court. But we do not think adequate consideration was given to the corroborative or additive value of this testimony.

■ Although its analysis of the problem was different, the Second Circuit's decision in United States v. Li Fat Tong,

5. U.S.Const. Amend. IV: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

1945, 152 F.2d 650, squarely supports the use of hearsay statements made to agents to make out reasonable cause for arrest. Semble, United States v. Heitner, supra; see Carroll v. United States, 1925, 267 U.S. 132, 161, 162, 45 S.Ct. 280, 69 L.Ed. 543. Rules for hearsay developed for purposes of safeguarding jury trials, or for otherwise controlling the proof of actual guilt, are without more not applicable on other questions. See, Brinegar v. United States, 1949, 338 U.S. 160, 173–174, 69 S.Ct. 1302, 93 L.Ed. 1879; Note, The "Probable Cause" Requirement for Search Warrants, 1933, 46 Harv.L.Rev. 1307, 1311. But see, Grau v. United States, supra, and Worthington v. United States, 6 Cir., 1948, 166 F.2d 557. The issue is the reasonableness of the belief, not proof of guilt sufficient to warrant imposition of criminal sanctions.

On the more general question of this case, whether all the facts add up to reasonable belief, we think that the decision of the Supreme Court in Brinegar v. United States, supra, supports our conclusion. There, the Court upheld a conviction based in part on the use in evidence of liquor seized without a warrant and allegedly, therefore, in violation of the Fourth Amendment. It appeared that Brinegar at the time of his arrest was driving from Missouri where the sale of liquor was legal towards Oklahoma where its sale was illegal. He was at a point quite near the state line. It further appeared that one of the arresting agents had arrested Brinegar some five months earlier for illegally transporting liquor, that he had twice seen Brinegar loading liquor in Missouri, and that he knew that Brinegar had a reputation for hauling liquor. This officer observed Brinegar and his car as Brinegar drove by, and he observed that the car appeared to be heavily weighted. These facts were held to constitute probable cause to believe that Brinegar was again transporting liquor from Missouri to Oklahoma.

It is perfectly obvious that in the Brinegar case it was consistent with innocence for Brinegar to be driving along a highway towards Oklahoma. Nor was it a necessary inference that one who once broke the law would break it again; nor that a weighted car had liquor in it. The only basis for upholding that arrest was that on all the facts known about Brinegar, it was reasonable to conclude that he was guilty of hauling liquor illegally again. We think the basis of belief is stronger in the present case.

■ It would not be particularly helpful to make a collection of similar cases which uphold or strike down particular arrests. The basic principle is clear: It must be reasonable to suppose that the person arrested is guilty. What is reasonable is a total judgment. Analogies predicated upon segmentation of the basis of judgment in a particular case are misleading. They tend to obscure the fact that differences small in themselves but highly significant in relation to other facts throw cases of this sort into entirely different perspective. The Brinegar case purported to rely on the familiar Carroll [6] case, and it considered in detail the factual differences between the cases and concluded that they were not important. A dissenting opinion urged the importance of these factual differences and emphasized differences in the legal context of the two cases. Without entering into that disputation, we are satisfied here that the arrest was well within the doctrine of both the Bringar and Carroll opinions, and as well, consistent with United States v. Di Re [7] and Johnson v. United States,[8] which were decided the other way and help to define the area of the Fourth Amendment's operation.

■ Finally, it is suggested that the arrest be invalidated because there was no "likelihood of [Bianco's] escaping before a warrant [could] be obtained for his arrest". This argument has two aspects: It is first pointed out that the mere fact that Bianco started his engine does not show that he was about to leave without obtaining his baggage. The argument ignores the pro-

6. Carroll v. United States, supra.

7. 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L. Ed. 210.

8. 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436.

viso that the likelihood be an escape before a warrant can be obtained, not merely an escape. But beyond that, the likelihood of escape of a suspect with an automobile near an urban community is too strong to ignore; the chances of successful pursuit, far too risky to rely on. Cf. Carroll v. United States, supra. The district court found that reasonable grounds for anticipating escape existed. The circumstances amply justified that conclusion.

■ Second, it is urged that the representatives of government had an adequate opportunity to obtain a warrant and therefore could not rely on an emergency their own delay created. The record does not support the argument. All of the events leading up to the arrest occurred within the space of one day. DuBois's investigation was not completed until the late afternoon of that day. The Pittsburgh office was called less than two hours later; and the arrest was made less than three hours after that. More important, no valid warrant could have been obtained before the agents knew that Bianco had crossed a state line with the lottery materials. Cf. United States v. Haberkorn, 2 Cir., 1945, 149 F.2d 720. No showing is made that a warrant could have been obtained within the short period available thereafter at that time of the evening. In all the circumstances before us, we cannot say that there was adequate opportunity to obtain a warrant.

For these reasons, the judgment will be reversed and the cause remanded to the district court for the entry of an order denying the relief prayed for in appellee's petition.

On Rehearing

HASTIE, Circuit Judge.

In a petition for rehearing, appellee Bianco has pointed out an inaccuracy in the statement of facts in the opinion of the court heretofore filed in this case. We stated that informers told Federal Bureau of Investigation agent duBois that one of the persons observed by duBois in the company of Bianco had transferred lottery material to Bianco. However, the evidence does not

show that the informers stated to duBois from whom Bianco received lottery material or whether the informers themselves had seen the material. The testimony, given by duBois himself, was merely that informers, believed to be reliable on the basis of past experience, had told him that the bag in question contained lottery material. There was no testimony as to the basis of the informers' statement.

However, nothing in the reasoning or the conclusion of the court turns upon whether the informers revealed to the FBI agent the basis of their statement as to the content of the bag. We have examined all contentions urged in the petition for rehearing and find none of them persuasive.

The petition will be denied.