**UNITED STATES of America**

v.

**John Clark LOW, Jr.**

**Crim. No. 66–41.**

United States District Court
W. D. Pennsylvania.
Aug. 11, 1966.

Sebastian C. Pugliese, Jr., Asst. U. S. Atty., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Hubert I. Teitelbaum, of Morris, Safier & Teitelbaum, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

The defendant, John Clark Low, Jr., in Criminal Action No. 66–41, was indicted for possession of counterfeit obligations of the United States, a felony under 18 U.S.C.A. § 472. He was arrested at Washington, Pennsylvania, toward midnight of November 6, 1965, by secret service agents while in possession of a satchel containing 4,666 counterfeit twenty-dollar Federal Reserve Notes and was immediately taken to the secret service office in Pittsburgh. There the satchel was opened, and he was questioned for a period of an hour to an hour and a half by the agent in charge, Paul T. Usher.

The defendant has moved to suppress all evidence obtained in conjunction with his arrest and subsequent interrogation. We think that the defendant's motion must be granted in part and denied in part.

Mr. Usher, agent Harry P. Stewart, and the defendant testified at a hearing. The following is a summary of the testimony.

During the last quarter of 1965, agents of the secret service office for the western district of Pennsylvania became aware of an unusually active circulation of counterfeit twenty-dollar Federal Reserve Notes within certain areas of the district. Some of this activity was concentrated in Washington County.

In October, agent Stewart of the Pittsburgh office received information that Low was connected with this activity; that he had handled a $10,000 counterfeit note transaction and had advanced $5,000 and indicated a desire to buy as much as $250,000 worth of counterfeit twenty-dollar notes.

Subsequently, on November 6, 1965, between 7:15 and 7:30 p. m., agent Stewart was told that there had been plans made for Low to accept delivery of counterfeit notes. About 7:30 p. m., agent Stewart met an informant, acting under secret service instructions, and another agent, Ivan Ford, at the Oak-

mont entrance to the Pennsylvania Turnpike, north of Pittsburgh. There Stewart first saw the satchel containing the counterfeit money, samples of which he examined. The satchel and the counterfeit were placed in the custody of agent Ford. Stewart was told that the delivery was tentatively scheduled for New Stanton, Pennsylvania, some distance east of Pittsburgh. Agent Stewart went to New Stanton, but no delivery took place. About 9:15 p. m., he was told that Low had arranged to accept the money at Washington, Pennsylvania, south of Pittsburgh, "within the hour". Agent Stewart then proceeded to Washington, Pennsylvania.

Sometime between 11:00 p. m. and midnight, Low arrived alone in his car at the combination Railway Express Agency and train station in Washington where the delivery was to take place. He parked across from the station and sat in his car waiting. The purpose of his being there was to pick up the satchel, which he knew would contain counterfeit bills. A quarter hour to a half hour later, a car driven by the secret service informant, accompanied by agent Ford, arrived at the station. Low recognized the car and blew his horn. Someone in the other car beckoned. Low then followed the other car into the station area and the two cars parked side by side. Low left his car and went to the other car. He got into the back by the left rear door. Inside, the driver, whom Low knew as Jack, introduced the passenger in the front seat. The passenger (agent Ford) said, " 'here it is' ", indicating the satchel of counterfeit money which was on the floor of the car in back on the right side. Low knew the satchel was supposed to contain $100,000 in counterfeit money. After about five minutes, Low left the car with the satchel and walked back to his own car. At this point, agent Stewart and three other secret service agents, who had been observing from positions around the station, commenced to walk toward Low's car. The car containing the secret service informant and agent Ford sped

away. Low opened the door to his car, threw the satchel on the front seat and got in behind the wheel. As he was about to start his motor, the driver's door was opened and a secret service agent said: "'You're under arrest.'" Low got out of the car backwards. As he did so, he tossed onto the front seat a revolver which he had pulled from under his belt.

In apprehending Low, the agents had neither an arrest nor a search warrant. Low's car, with the satchel of counterfeit notes and the revolver still on the front seat, was driven to Pittsburgh by agent Stewart. Low was taken, handcuffed, in a secret service car. At the secret service office, agent in charge Usher told the agents to remove the handcuffs. Low was taken into Usher's office and seated there. Usher told Low: "'All right, you understand this, you're in here on a serious matter, and you have to say nothing. You're not required to say anything, and before you say anything, you're entitled to call an attorney.'" Low, according to Usher, said: "'All right. * * * I want to get rid of this stuff. * * * I'm just a little man. * * * I'm not more than an in-between.'" Usher said: "'Now, wait a minute.'" Usher then looked at the counterfeit money and found out from the agents what had happened in Washington, while Low interjected some statements. Usher then said to Low: "'What do you want to tell us about this?'" Low at this point gave the oral statement he seeks to have suppressed.

Agent Stewart was present during part of the questioning and confirmed the fact that Low was advised of his constitutional rights. Stewart testified: "Mr. Usher advised him of his rights, that he did not have to make any statements, that anything that he said could be used against him. He was advised that he could consult with an attorney. As a matter of fact, he was advised to get himself an attorney."

About 3½ hours after his arrest, Low was returned to his home by the agents and released from custody. At this time, he took agent Stewart into his home and showed him $15,000 in lawful currency which he said was to be used to purchase additional counterfeit money in a second transaction to be completed that Sunday.

Low contends that he cooperated "all the way" with the agents who stated that "if I cooperated, it would go easier on me" and, alternatively, that if he did not tell them what they wanted to know "they said I could go to jail * * * that morning." He could not say which agent, or whether more than one agent, said this to him. These statements were not contradicted.

Low was not taken before a commissioner that night or at any other time. He was indicted February 10, 1966, and is at liberty on his own recognizance.

The bases of the defendant's motion to suppress the evidence are: (1) unreasonable search and seizure pursuant to an unlawful arrest, (2) obtaining self-incriminating statements while he was without the guidance of counsel, (3) obtaining those statements without prompt arraignment before a commissioner, and (4) obtaining those statements through coercion by a promise of leniency coupled with the alternative threat of jail.

Low contends that the tangible evidence seized at his arrest, consisting of the revolver and the satchel containing the 4,666 counterfeit twenty-dollar Federal Reserve Notes, should be suppressed. We find no merit in any of his arguments in support of this contention. We conclude that his arrest without a warrant was lawful.

The authority of secret service agents to arrest without warrant is derived from § 3056, Title 18 U.S.C.A., as amended, which reads in its pertinent part as follows:

"Subject to the direction of the Secretary of the Treasury, the United States Secret Service, Treasury Department, is authorized to * * * detect and arrest any person committing any offense against the laws of the United States relating to * * *

obligations * * * of the United States * * *. In the performance of their duties under this section, * * * agents of the Secret Service are authorized to make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have *reasonable grounds* to believe that the person to be arrested has committed or is committing such felony." (Emphasis supplied.)

In United States v. LaMacchio, 362 F.2d 383 (3d Cir. June 23, 1966), the Court said in reference to § 3052, Title 18 U.S.C.A., a parallel statute (see discussion, infra):

"The 'reasonable ground' requirement of the statute is equivalent to the 'probable cause' requirement of the Fourth Amendment. Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Elgisser, 334 F.2d 103, 109 (2nd Cir. 1964), cert. den. 379 U.S. 879, 85 S.Ct. 148, 13 L.Ed.2d 86. The legality of the warrantless * * * [arrest] here in question must be tested by this standard. If * * * [it was] made without probable cause the subsequent search and seizure was illegal.

"Probable cause exists where the facts and circumstances within the knowledge of the arresting officers, and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been or is being committed and that the person to be arrested was or is the offender. Henry

v. United States, supra; Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. Elgisser, supra; Williams v. United States, 113 U.S.App. D.C. 371, 308 F.2d 326 (D.C. Cir. 1962).

" * * * The narrow question which must be determined is whether the arresting officers had reasonable grounds to believe that the * * * [defendant was] the * * * [offender]. This determination must be based upon a consideration of the totality of facts and circumstances. United States v. Bianco, 189 F.2d 716, 721 (3rd Cir. 1951); Ralph v. Pepersack, 335 F.2d 128, 132 (4th Cir. 1964), cert. den. 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811."

See also, Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878).

It is the function of the court to determine whether the facts available to an officer at the moment of arrest "would 'warrant a man of reasonable caution in the belief'" that an offense had been committed. Beck v. State of Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

Since agent Stewart had seen the counterfeit currency in the satchel earlier that evening, he and the other agents arrested Low [1] in a reasonable belief, based on actual knowledge as well as hearsay, [2] that Low had accepted delivery of counterfeit notes.

What the agents observed at the scene was consistent with what they had learned from hearsay. They observed the informant, Jack, and agent Ford arrive at the scene. The agents knew that

---

[1]. It is not certain whether Stewart or another agent made the actual arrest. The uncertainty is not critical to the question of reasonable grounds, however, since one agent may act on information supplied to him by another agent. United States v. Bianco, supra, 189 F.2d p. 719.

[2]. Hearsay evidence derived from an informer is competent evidence on which to

show probable cause for an arrest, though the weight to be given it is a matter for the sound discretion of the court. United States v. Miguel, 340 F.2d 812, 814 (2d Cir. 1965); United States v. Bianco, supra, 189 F.2d pp. 720, 722; United States v. Li Fat Tong, 152 F.2d 650 (2d Cir. 1945).

these men carried with them a satchel of counterfeit notes and that the purpose of their being there was to deliver this counterfeit money to Low.

To be sure, the arresting agents could not see what transpired in the dark interior of the informant's car.[3] However, they observed Low leave his car and get into the informant's car, remain there five minutes or so and then return to his own car with the satchel, and when they arrived at Low's car to make the arrest, they could see the satchel on the seat of the car. These observations were sufficient to establish reasonable grounds for a belief that Low had taken possession of the counterfeit notes. Certainty is not demanded. The fruits of the subsequent search were not essential to the establishment of reasonable grounds for such belief. Therefore, cases which hold that an arrest is not justified by what a subsequent search discloses are not in point. Cf. Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948).[4]

■ The defendant further contends that this arrest was unlawful because the agents had ample time to secure an arrest warrant. In support of this position, the defendant cites the language of Chief Judge Learned Hand in the case of United States v. Coplon, 185 F.2d 629, 632, 635, 28 A.L.R.2d 1041 (2d Cir. 1950) to the effect that the arrest, being without warrant, was not lawful because

"no sudden emergency forced the hand of the agents * * *." The defendant's reliance on this case is misplaced, however, since the decision turned on the language of 18 U.S.C.A. § 3052 which, as of the date of that decision, made it lawful for F.B.I. agents to arrest without warrant "for felonies cognizable under the laws of the United States, where the person making the arrest has reasonable grounds to believe that the person arrested is guilty of such felony and *there is a likelihood of his escaping before a warrant can be obtained for his arrest.*" (Emphasis supplied.) But § 3056, as amended, which gives secret service agents the power to arrest without warrant, contains no reference to, or requirement of, the likelihood of escape.[5] There is nothing in the statutory language of § 3056 to support the interpretation that secret service agents have the power to arrest without warrant only when confronted with the likelihood of an escape. Moreover, there was a likelihood that Low could escape since he was in his private automobile.

■ We conclude that in taking the defendant Low into custody, the agents had reasonable grounds to believe that Low was then committing a felony, that reasonable grounds for anticipating escape in his automobile existed, and that in all the circumstances, the defendant's arrest without warrant was lawful. United States v. LaMacchio, supra; United States v. Bianco, supra, 189 F.2d p. 722.

---

3. Agent Ford did not testify at the hearing.

4. The circumstances do not, as the defendant contends, indicate that the purpose of this arrest was to justify a search for evidence rather than to apprehend the person involved. To the contrary, the circumstances indicate that the purpose of the arrest was to apprehend an individual who, secret service agents had reasonable grounds to believe, was an important contributor to flourishing counterfeit activity. The decisions of the Court in United States v. Lefkowitz, 285 U.S. 452, 463, 52 S.Ct. 420, 76 L.Ed. 877 (1932) and in Go-Bart Co. v. United

States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 375 (1931) that "[a]n arrest may not be used as a pretext to search for evidence" (United States v. Lefkowitz, supra, 285 U.S. p. 467, 52 S.Ct. p. 424) therefore have no bearing in deciding the lawfulness of this arrest.

5. Section 3056 did not originally contain the authorization to arrest without warrant, which was added by an amendment of September 29, 1965. It is also pertinent to note that subsequent to the Coplon case, § 3052 was amended January 10, 1951 to eliminate this requirement of the likelihood of an escape.

■ The defendant also contends that the seizure of the satchel from his automobile was illegal and that the use in evidence against him of the contents thereof should be suppressed. Having found that the arrest of the defendant was lawful, we also find that the search and seizure, being incident to a lawful arrest, were not unreasonable. "When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution." Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925). More recently the Court has said: "[T]he search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control." Harris v. United States, 331 U.S. 145, 151, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947). Here, the agents seized a revolver and a satchel which were found on the seat of the car adjacent to where the defendant had been sitting when he was arrested. These were taken to the secret service office where the satchel was properly opened by the agent in charge. Cf. United States v. Bianco, supra.[6] The defendant was in the secret service office at this time.

■ Moreover, the satchel and the counterfeit money in it "were not property the ownership or possession of which the law protects. See Brinegar v. United States, 1949, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879. * * * [The money and satchel] were contraband, subject as such to seizure without warrant and over the possessor's objec-tion. * * * 49 U.S.C.A. § 781(b) (3)." United States v. Troiano, 365 F. 2d 416 (3d Cir. July 22, 1966).

■ We find no facts which support the suppression of this evidence as the fruits of an unreasonable search and seizure. To the contrary, we find: (1) the search and seizure were incident to a valid arrest; (2) the place of the search was a vehicle being used to further an unlawful purpose; (3) the search was confined to an area under the immediate and complete control of the defendant; and (4) the possession of the counterfeit notes was a crime and objects utilized in perpetrating the crime were properly subject to seizure. What is a reasonable search and seizure is not to be determined by a fixed formula. The reasonableness of a search must find resolution in the facts and circumstances of the particular case. United States v. Rabinowitz, 339 U.S. 56, 63–64, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

■ Low further moves for the suppression of all statements made by him during the course of his custodial interrogation by the agent in charge, Usher, in the secret service office. During the period he was in custody, it is undisputed that the defendant did not have an attorney present. We believe that all statements made by Low after he was taken into custody, whether to Usher or to other agents, must be suppressed.

The defendant has urged several grounds for suppression.[7] We believe, however, that Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), is fully dispositive of this aspect of the defendant's motion and therefore limit discussion to the prin-

6. In Bianco, the defendant's hand luggage was checked in the custody of an airline when it was seized and later searched in the F.B.I. office after a warrantless arrest (see: United States v. Bianco, 94 F. Supp. 239, f. n. 3); the motion to suppress evidence of the illegal contents thereof was denied by the Court of Appeals (189 F.2d 716, supra).

7. The defendant contends that his statements must be suppressed because: (1) they were made as the result of an illegal detention under Rule 5(a), Fed.R.Crim. P.; (2) they were made under promise of "leniency" with the alternative of "jail" and consequently were coerced rather than free and voluntary; and (3) they were made at a time when the defendant was not aided by counsel and had not made an intelligent waiver of counsel.

ciples there set out as they relate to the circumstances of the defendant's custodial interrogation. Although Low testified that he could not remember being advised of his constitutional rights, the evidence discloses that in conformity to *Miranda,* Usher advised Low of his right to remain silent, warned him that anything he said might be used in evidence against him, and advised him of his right to consult with an attorney and to call an attorney before he said anything. However, the evidence fails to disclose that Low made a knowing and intelligent waiver of his right to counsel.

With respect to the demonstration of a waiver, the Court in Miranda v. State of Arizona, supra, p. 475, 86 S.Ct. p. 1628, has issued a strongly-worded caveat:

> "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

The Court further said at page 475, 86 S.Ct. p. 1628:

> " * * * [A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. * * * "

> " * * * Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Id., p. 476, 86 S.Ct. p. 1628.

The warnings required and the necessary waiver are "prerequisites to the admissibility of any statement made by a defendant." Id., p. 476, 86 S.Ct. p. 1629. Not all statements are proscribed. "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admis-

sible in evidence." Id., p. 478, 86 S.Ct. p. 1630.

Applying these criteria to the interrogation of Low, we find that he displayed little reluctance to talk to his interrogator and attempted to divulge information even before he was warned of his rights and subjected to questioning. But we cannot find that his statements were made "freely and voluntarily without any compelling influences" or that interrogation took place only after he had "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." To the contrary, Low was questioned in an environment threatening with "compelling influences". He had been transported some distance in handcuffs by secret service agents. He had been brought into the secret service office in handcuffs, though they were removed before questioning commenced. Most damaging of all from the government's standpoint is Low's uncontradicted testimony that he was told that "if I cooperated, it would go easier on me" and if he didn't "they said I could go to jail * * * that morning." According to Low, this was said to him five or ten minutes after he was brought into the secret service office. Moreover, the circumstances of the interrogation in the early morning hours without benefit of arraignment were clearly conducive to that impression.

These factors take on special significance in light of the Court's statement in Miranda v. State of Arizona, supra, that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

Furthermore, agents Stewart and Usher nowhere in their testimony attribute to Low words which could be held "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." The only evidence bearing on this is Usher's testimony that after he fin-

ished his warning, Low said: "All right." Without further amplification, this statement, in light of the strict standards of Miranda, must be regarded as inconclusive. In Miranda, 384 U.S. at page 475, 86 S.Ct. at 1628 the Court quotes its own earlier statement in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962), as applicable:

> " 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' "

The record before us does not sustain the heavy burden which "rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." For this reason all statements made by the defendant to any agent during this period of his custody must be suppressed.

An appropriate order will be entered.