UNITED STATES of America,
Appellee,

v.

Jerry Edgar MILES et al.

Appeal of George KIRBY.

No. 71-1465.

United States Court of Appeals,
Third Circuit.

Argued April 7, 1972.

Decided Sept. 29, 1972.

Martin M. Sheinman, Kirk, LaLama & Sheinman, Pittsburgh, Pa., for appellants.

Kathleen Kelly Curtin, Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., Samuel J. Orr, III, Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE and GIBBONS, Circuit Judges, and BECKER, District Judge.

## OPINION OF THE COURT

EDWARD R. BECKER, District Judge.

### 1. PRELIMINARY STATEMENT

This is a bank robbery case. On February 10, 1966, defendants, Miles, Kirby, and Vaughn, were indicted under 18 U. S.C. § 2113(a) and (d), and on September 8, 1966, verdicts of guilty were returned against each of them by a jury in the District Court for the Western District of Pennsylvania. All defendants appealed those convictions and were awarded new trials.[1] At the beginning of the (joint) second trial, defendants Miles and Vaughn entered pleas of guilty to both counts of the indictment and the trial proceeded only against the present appellant, George Kirby ("Kirby"). Kirby was again found guilty by a jury and this appeal followed.

Kirby's request for relief is predicated on the contentions that: *First*, the search and seizure of certain evidence which played a substantial role in his conviction was not incidental to a lawful arrest and cannot be justified on any other grounds; *Second*, the defendant was deprived of his Fifth Amendment rights by the court's charge to the jury that the unexplained possession of recently stolen property raises an inference of guilt; *Third*, the trial court erred in receiving the testimony of Pittsburgh Police Sergeant Tercsak regarding Kirby's alleged flight; and *Fourth*, the evidence was insufficient as a matter of law to sustain the conviction. For the reasons set forth below, we affirm.

### II. THE RELEVANT FACTS AND THE COURT'S PRIOR OPINION

The basic facts, as they appear of record in the trial transcript and in the transcript of the motion to suppress evidence heard before the first trial, may be summarized as follows. At approximately 2:00 p. m. on October 27, 1965, the Eureka Savings and Loan Association, located in the Oakland section of Pittsburgh, was robbed at gunpoint by two Negro males wearing raincoats and hats. As the robbers exited the bank with $11,006, the bank comptroller, Mr. Braun, followed them to an alleyway which opened onto Fifth Avenue. At about that time, one Mr. Obritz, who was waiting in his car for a traffic light on Fifth Avenue, noticed two Negro males hurry out of this alleyway, cross Fifth Avenue and jump into a Pontiac convertible parked next to him in the curb lane. The Pontiac, driven by a third individual, then "zoomed" down Fifth Avenue in front of Mr. Obritz, who thereupon noted on an old tissue box, the license number and a description of the car. Further investigation revealed that the Pontiac was owned by the defendant Vaughn and that defend-

---

1. New trials were required because this court held that the Government's method of impeaching its own witness was preju-   dicial to the defendants, 413 F.2d 34 (3d Cir. 1969).

ants Vaughn and Miles and an unidentified Negro male had been seen together by Pittsburgh Police Inspector Moore in and out of the car about 1½ hours before the robbery. Responding to a police broadcast, two police patrolmen located and recovered the Vaughn vehicle at about 7:00 p. m. of the day of the robbery. An immediate examination of the car revealed several latent fingerprints which were soon identified as those of Miles and Kirby. One of the tellers identified Miles as one of the robbers. Although there were no positive identifications of Kirby, he fit the general description of the other robber given by several tellers and he also matched the general description of the unidentified man seen with Miles and Vaughn 1½ hours before the robbery.

On the basis of the facts just recited surrounding the robbery, on November 4, 1965, Sergeant Tercsak, Chief of the Robbery Division of the Pittsburgh Police, sent Detective Giorgianni to a city magistrate to procure an arrest warrant for Kirby.[2] Giorgianni told the magistrate nothing more than that he desired a warrant for Kirby for armed robbery of the Eureka Savings and Loan, and the magistrate issued it. On November 5, Sgt. Tercsak sent a teletype to New York City requesting that the local police look for Miles and Kirby at several addresses that had been furnished to the Pittsburgh police. On November 6, the New York police informed Sgt. Tercsak that they had been unable to locate the suspects. On November 7, Sgt. Tercsak again sent Detective Giorgianni to procure arrest warrants for both Miles and Kirby in order to initiate grand jury proceedings. While it is not clear whether Detective Giorgianni was under oath, it is clear (and indeed critical) that on *this* occasion he did relate to the magistrate the facts on which the police relied, i. e., the fingerprints of Miles and Kirby were found in the suspected getaway car, the identification by victims, that Miles and a person resembling Kirby were seen together about 1½ hours before the robbery by other detectives, and that the police had information that they had fled to New York under assumed names (see discussion *infra*). Thereupon, the magistrate issued warrants for both Miles and Kirby. On November 9, the Pittsburgh police came into contact with a girlfriend of Kirby who informed them that Kirby was staying in Room 1255 of the Chesterfield Hotel in New York, possibly under an assumed name. At about 4:00 p. m. on that afternoon, Sgt. Tercsak telephoned the New York City Police Correspondence Unit and relayed the additional information obtained from Kirby's girlfriend.

This November 9th message was communicated by the Correspondence Unit to New York City Police Detective Daly[3] who thereupon proceeded to the Chesterfield Hotel and ascertained that room 1255 was registered to a Mr. and Mrs. Milo Jackson. During a warrantless search of the room, Detective Daly found suitcases with the names Miles and Kirby on them and certain weapons and drug paraphernalia.[4] At the conclu-

2. The United States Government had previously procured a warrant for Miles.

3. The message received by Daly through the New York City Police Correspondence Unit was as follows:
"[T]wo men were wanted for armed robbery of the Eureka Savings and Loan Association in Pittsburgh, Pennsylvania of $11,000. This information was gotten from Sargeant [sic] Tercsak in the Robbery Squad of Pittsburgh. They were staying at the Hotel Chesterfield, 130 W. 49th Street, Room 1255. [The Correspondence Unit] then gave us the name George Kirby, AKA Williams.

"A male negro, forty years of age, five feet eight, brown skin, Jerry Miles, male negro, thrty-one [sic] five feet eleven, dark skin. . . . [T]hey were both armed and considered dangerous, and [the Pittsburgh Police] have warrants."

4. The items seized from the hotel room by the New York police were the subject of a pretrial motion to suppress and the motion was granted as to those items on the basis that the failure to obtain a search warrant was unlawful in the absence of any exceptional circumstances. That ruling was not appealed from and it has no relevance to evidence upon which conviction rests.

sion of several hours of surveillance dur-ing which New York was "blacked-out" by a massive power failure, Detective Daly and other officers went to dinner and to procure flashlights. Upon returning to the hotel around 9:30 p. m., they were joined by still another officer who stated that the station had just received a call from the hotel that the occupants of room 1255 were in the lobby. As the police entered, they recognized Miles and Kirby from the descriptions that had been provided to them and apprehended them. They were taken to a stairwell and subjected to a weapons frisk. Money, including "bait money" from the Eureka Savings & Loan which had been taken at the time of the robbery, was removed from Kirby but immediately replaced when it was determined that it was not a weapon. Following a search of the room, Miles and Kirby were taken to the stationhouse, where a more thorough search of the defendants was made than could be properly conducted at the hotel because of the continuing power failure (lasting until about 6:00 a. m. the next morning). All their belongings were impounded and subsequently turned over to the Pittsburgh authorities, although the "bait money" was not recognized as such until the money was checked in Pittsburgh.

As we have noted above, prior to the first trial the defendants moved to suppress the bait money as evidence. The motion was denied, and the money was introduced into evidence by the Government. Following the convictions, the denial of the motion to suppress was assigned as error both on the trial court and on appeal. The grounds asserted were that the arrests were unlawful because the warrants were defective and that, even if the arrests were lawful, the seizure was not incident thereto.

On (the first) appeal, Judge Seitz, speaking for the Court, approached the arrest issue by stating:

"Unquestionably, a police officer in one jurisdiction may arrest without a warrant a fugitive from another jurisdiction so long as the arresting of-ficer has probable cause to make the arrest and the arrest is lawfully effected in the jurisdiction where it is made." (citation omitted). United States v. Miles et al., 413 F.2d 34, 40 (3d Cir. 1969). *See also*, United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

Judge Seitz found that a warrantless arrest for an out-of-state felony is permissible under New York law if based on probable cause. On the issue of whether or not probable cause existed, Judge Seitz noted that the appellants including Kirby did not argue that the information transmitted to the New York police was not sufficient to give Detective Daly probable cause to arrest for the Pittsburgh robbery. He added:

"They do not urge that the information was somehow deprived of its vitality by passing through the chain of communication outlined above. Nor do the appellants challenge the sufficiency of the factual data possessed by the Pittsburgh authorities." (footnote omitted). United States v. Miles, 413 F.2d 34, 40 (3d Cir. 1969).

Judge Seitz went on to hold that the seizure of the "bait money" was valid as a lawful search incident to a lawful arrest.

At appellant's second trial, no additional facts concerning the arrest and search and seizure were presented to the court. The "bait money" was again admitted into evidence over counsel's objection that the search was not incident to arrest. However, on appeal, the appellant has abandoned this argument and, instead, contends that the search and seizure was invalid because of a lack of probable cause to arrest. Appellant grounds his probable cause argument on the decision of the Supreme Court in Whiteley v. Warden, 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971), and attempts to justify its assertion for the first time on this appeal on the grounds that *Whiteley* was decided since Judge Seitz's opinion on the first appeal in this case. While we could dispose of the

issue on the grounds that appellant has failed to challenge the validity of his arrest until this stage in the litigation, not raising the issue at either trial or on the first appeal, we deem it appropriate to deal with the issue on the merits.

## III. VALIDITY OF THE ARREST

In *Whiteley*, the sheriff of a sparsely populated Wyoming county swore to a complaint charging petitioner and another with breaking and entering into a business establishment in his county. The only basis for the complaint was the tip of an unidentified informant. Although this "fact" was not contained in the complaint or otherwise communicated to the Justice of the Peace, arrest warrants were issued nevertheless. Subsequently, the sheriff broadcast descriptions of the suspects and their car over statewide police radio. Petitioner was apprehended in another locality by police officers who acted upon that message.

The *Whiteley* court first analyzed the complaint and easily concluded that it was insufficient "to support an independent judgment that probable cause exists for the warrant [citations omitted]." Whiteley v. Warden, 401 U.S. 560, 564, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971). Next, the court applied the

same probable cause standards to the arresting officers and concluded, on the basis of Draper v. United States, 358 U. S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), that the arresting officers did not have probable cause to arrest. However, in response to the state's argument that the radio bulletin supplied the arresting officers with the requisite probable cause, the court noted:

"We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers . . . in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." Whiteley v. Warden, *supra* at 568, 91 S.Ct. at 1037.

Unlike a search warrant,[5] an arrest warrant is not a constitutional prerequisite to an arrest.[6] Moreover,

---

5. Warrantless searches are *per se* unreasonable absent "exigent circumstances." Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

6. As Mr. Justice White noted in dissent in Coolidge v. New Hampshire, *supra*, 403 U.S. at 510–511, 91 S.Ct. at 2060 (footnote omitted):

"As to persons, the overwhelming weight of authority is that a police officer may make an arrest without a warrant when he has probable cause to believe the suspect has committed a felony."

However, we note too the concern expressed by Mr. Justice Stewart in *Coolidge* of the dissimilar requirements for warrantless arrests and searches. He laments:

"Indeed, if Mr. Justice White is correct that it has generally been assumed that the Fourth Amendment is not violated by the warrantless entry of a man's

house for purposes of arrest, it might be wise to re-examine the assumption. Such a re-examination 'would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment.' Jones v. United States, 357 U.S. 493, at 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514.

. . . But we find it unnecessary to decide the question in this case. . . ." Coolidge v. New Hampshire, *supra*, 403 U.S. at 480–481, 91 S.Ct. at 2045.

In United States v. Davis, 461 F.2d 1026 (3d Cir., filed May 31, 1972), this Court found it unnecessary to decide the same issue, terming it an "open question."

even if an arrest warrant has been issued and it is invalid, the arrest may be lawful if the arresting officer had probable cause to believe that the suspect was committing or had committed a felony. United States ex rel. Gockley v. Myers, 450 F.2d 232 (3d Cir. 1971); United States ex rel. Moore v. Russell, 330 F.Supp. 1074 (E.D.Pa.1971); United States v. Wilson, 451 F.2d 209 (5th Cir. 1971); Page v. United States, 437 F.2d 440 (9th Cir. 1970); United States v. Hall, 348 F.2d 837 (2d Cir. 1965). Appellant does not contend that *Whiteley* holds that the arrest and subsequent search and seizure are unlawful if an arrest warrant is defective for reasons other than a lack of probable cause [7] or that warrantless arrests are *per se* unreasonable absent "exigent circumstances." However, contrary to defendant's assertion, *Whiteley* does not introduce a new principle of law—it merely echoes the principles announced some twenty years previously by this Court in United States v. Bianco, 189 F.2d 716 (3d Cir. 1951).

In the *Bianco* case, the defendant was arrested by a special agent of the FBI in Pittsburgh on the basis of information communicated to the arresting agent from a special agent in Baltimore. The core of this information was the summary assertion that a third Baltimore agent "had received reliable information that Bianco would take the 8:25 plane [and] that he had lottery materials with him. . . ." In deciding whether the Pittsburgh officers had probable cause to make the arrest,[8] Judge Hastie, speaking for the Court, stated:

> "We hold that the arrest is not invalidated because detailed information as to its rational basis known to the Baltimore agent duBois was not communicated to the arresting agent Drew [the arresting officer in Pittsburgh].

> .   .   .   .   .   .

> The agent who relies on the summary assertions of his coagent can acquire therefrom no greater authority than could have been exercised by the coagent had he been in the arresting officer's position. A telephone message cannot immunize irresponsible investigation." United States v. Bianco, *supra* at 719.[9]

Thus, the law in this circuit since 1951 and the law as announced by *Whiteley* is that, while the officer in a distant juris-

---

The facts of that case were held to present an exception to the warrant requirement. Nor should we unnecessarily decide this difficult constitutional question here, for the arrests were made in a public place. *Cf.* Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc), holding that the circumstances justified a warrantless unconsented entry of a home to make an arrest, but also going on to decide that in unexceptional circumstances a warrant is needed to make an arrest in a home. *See also* United States v. Bazinet, 462 F.2d 982 (8th Cir. 1972), upholding a warrantless arrest in a public place based on probable cause, and noting that the issue of the validity of warrantless arrests in the home was then before the Supreme Court, Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 argued Jan. 10, 1972. The Court has since announced that it was unnecessary to decide the lawfulness of the arrest in that case since no fruits thereof were used at the trial. 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972).

7. The government concedes that the Pittsburgh warrants were defective because they were not issued on affidavit.

8. For the purpose of our discussion, we attach no significance that the arrest in *Bianco* was governed by 18 U.S.C. § 3052 which provided that:

> "agents of the Federal Bureau of Investigation . . . may . . . make arrests without warrant . . . for any felony cognizable under the laws of The United States. [where the person making the arrest has reasonable grounds to believe that the person arrested is guilty of such felony and *there is a likelihood of his escaping before a warrant can be obtained for his arrest*]."

The italicized portion of the statute has subsequently been deleted.

9. The court went on to hold that the Baltimore agents had probable cause.

diction may assume that the instigating officer had probable cause for an arrest and may arrest on that basis, the arrest is unlawful unless the instigating officer did in fact have probable cause to make the arrest, *i. e.,* "information which would 'warrant a man of reasonable caution in the belief' that he had forged that document. [citation omitted]." United States ex rel. Gockley v. Myers, *supra,* 450 F.2d at 234.[10]

Appellant strenuously argues that the Pittsburgh police lacked probable cause. This assertion is based on facts of record concerning the procurement of the warrant on November 4, when the officer merely represented to the magistrate that Kirby had committed the robbery. If the swearing officer and his superiors had no facts on which to base this conclusion, our case would fall squarely within the holding of *Whiteley.* *See* United States v. Morris, 445 F.2d 1233 (8th Cir. 1971). However, appellant's reliance on the warrant of November 4 is misplaced. As we noted *supra,* a warrant for Kirby was also issued on *November 7.* At that time, as we have noted, Detective Giorgianni recited to the city magistrate the following facts:

> "I told the magistrate that I wanted to get warrants for these two subjects for various reasons. They were identified by one of the victims of the bank, and both defendants [Miles and Kirby] were seen about an hour before by a couple of our other detectives prior to the robbery, and their fleeing to New York under an assumed name and trying to go to New York. And also finger prints were

found in an automobile of a third subject, the car they were seen in prior to the robbery." Testimony of Detective Giorgianni at Suppression Hearing.

■ These facts conveyed to the magistrate comported substantially with the knowledge possessed by Sgt. Tercsak, *see* United States v. Stratton, 453 F.2d 36 (8th Cir. 1972), prior to the obtaining of the November 7 warrant, *i. e.,* that Kirby generally fit the description of one of the robbers and that Miles was more positively identified as one of the robbers; that Kirby generally fit the description of the man seen with Miles and Vaughn about an hour before the robbery; that the clothes worn by one of the men seen by Mr. Obritz matched the clothes worn by the unknown man accompanying Miles and Vaughn about an hour before the robbery; that Miles and Kirby could not be found in Pittsburgh which tended to corroborate their information that they had fled; and that Kirby's fingerprints were found in the suspected getaway car. We find that the above facts constituted probable cause to arrest, *see* United States ex rel. Grano v. Anderson, 446 F.2d 272 (3d Cir. 1971), and that the New York City police were justified in acting on the teletype communication from the Pittsburgh police. Thus, the New York City police also had probable cause to arrest the appellant Kirby.[11]   *See* United States ex rel. Hollman v. Rundle, 461 F. 2d 758 (3d Cir., filed June 9, 1972).

Since we have found probable cause to arrest, and since this Court has previously decided that the search was incident to the arrest and was otherwise

10. *Whiteley* also held that the court must review a police officer's assessment of probable cause by the same standards as it would in reviewing a magistrate's assessment as a prelude to issuing a warrant.

11. In *Whiteley,* the court found that the arresting officer lacked probable cause to arrest because the instigating officer's conclusion rested only on an informant's tip which failed to meet the requirements of *Draper* and *Spinelli.* Here, the information possessed by the Pittsburgh po-

lice came from witnesses and fingerprint verification. The only information that might be considered a "tip" is that of Kirby's girlfriend. In any event, that "tip" was corroborated by the New York City police when they learned that persons answering the descriptions of Miles and Kirby were, in fact, registered at the Chesterfield as stated by Kirby's girlfriend. Thus, the sources of the information upon which the police relied were constitutionally much stronger than those in *Whiteley.*

lawful under the circumstances, we hold that the "bait money" was properly admitted into evidence.

### IV. THE FIFTH AMENDMENT CLAIM

■ Appellant next contends that the trial court's instruction concerning the inferences that can be drawn from the unexplained possession of recently stolen property was in error because this instruction penalized the defendant for his failure to testify.

The inference of guilt arising from the possession of recently stolen property is well-established in the law. Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); United States v. Hamilton, 457 F.2d 95 (3d Cir. 1972). However, the charge did not violate the defendant's Fifth Amendment rights, in that it expressly stated that the inference may be rebutted from any source whatsoever, not limited to defendant's testimony. The charge comports with that approved in United States v. Ruggere, 450 F.2d 302 (3d Cir. 1971). We hold there has been no violation of appellant's Fifth Amendment rights.

### V. THE COURT'S INSTRUCTION ON FLIGHT

■ Kirby contends that the testimony of the law enforcement officers concerning flight was prejudicial and requires reversal. Sgt. Tercsak testified at trial about the unsuccessful efforts of the Pittsburgh police to locate Miles and Kirby for more than two weeks after the robbery. Mr. Fuselier, a Special Agent for the FBI, also related his unsuccessful efforts to locate appellant. In combination, these agencies checked the bars, hotels, friends' and relatives' homes, and all other places Kirby was known to frequent, but they were unable to locate Kirby and Miles in or around Pittsburgh. The trial court instructed the jury as follows:

"The flight or concealment of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by the jury in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flights or concealment shows a consciousness of guilt, and the significance if any to be attached to such a circumstance, are matters for determination by you, the jury.

*In this instructing you upon the subject of flight or concealment, let it be understood that I do not declare to you, or even remotely suggest, that the Defendant did either so take flight or so conceal himself immediately after the commission of the offenses defined in Count I and Count II of the indictment, or either of such counts, or at any other time. Whether he did so take flight or so conceal himself, you will determine from all of the evidence in the case.* And, unless you find that he did so take flight or conceal himself, you will entirely disregard my instruction just imparted to you upon those questions." (emphasis added).

While some doubt has been expressed about the probative value of evidence of flight, *see* Wong Sun v. United States, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), it has been consistently held admissible as circumstantial evidence of guilt to be considered with the other facts of the case. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Bailey v. United States, 410 F.2d 1209 (10th Cir.), cert. denied, Freeman v. United States, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969); United States v. Heitner, 149 F.2d 105 (2d Cir. 1945); Vick v. United States, 216 F.2d 228 (5th Cir. 1954); United States v. Pate, 342 F.2d 646 (7th Cir. 1965); Leathers v. United States, 250 F.2d 159 (9th Cir. 1957); Green v. United States, 104 U.S.App.D. C. 23, 259 F.2d 180 (1958). Moreover, the defendant need not be aware of the

charges against him, for "it is the act of the departure that is itself evidential." 2 Wigmore on Evidence § 276 (3d ed. 1970). There was sufficient evidence to justify the trial court's instruction to the jury on the issue of flight. That instruction was proper and protected the rights of the defendant.

## VI. SUFFICIENCY OF THE EVIDENCE

■ The appellant's final argument is that the evidence was insufficient as a matter of law to sustain a conviction. When sufficiency of the evidence is at issue on appeal, it is fundamental that we must view the evidence in the light most favorable to the government. United States v. Hamilton, 457 F.2d 95 (3d Cir. 1972); United States v. De Cavalcante, 440 F.2d 1264 (3d Cir. 1971). The evidence taken in that light includes the following: (1) several bank tellers tesified that one of the two robbers fit Kirby's general description although they were unable to positively identify Kirby as one of the perpetrators; (2) two detectives had seen a man fitting Kirby's general description with Miles and Vaughn (who pleaded guilty) about one hour before the robbery; (3) the appellant's fingerprints were found in Vaughn's car which was seen speeding away from the area of the robbery moments after it took place; (4) the appellant left town after the robbery, and (5) the "bait money" was found on the appellant's person twelve days after the robbery. We cannot say that this evidence and the reasonable inferences which can be drawn therefrom, when viewed in the required light, do not support the jury's verdict.

The District Court will be affirmed.

Circuit Judge HASTIE would reject the present tardy attack upon the validity of appellant's arrest solely on the ground that neither in support of his motion to suppress the fruits of the arrest nor as part of his defense at either trial did appellant contend that probable cause for arrest was lacking.