UNITED STATES of America

v.

**Jerry Edgar MILES, Wilbert Theodore Vaughn, and George Kirby, Appellants.**

Nos. 16270–16272.

United States Court of Appeals Third Circuit.

Argued March 7, 1969.

Decided June 25, 1969.

Orlando N. Prosperi, Greensburg, Pa., for Jerry Edgar Miles.

Barney Phillips, Pittsburgh, Pa., for Wilbert Theodore Vaughn.

Alvin D. Capozzi, Pittsburgh, Pa., for George Kirby.

Stanley W. Greenfield, Asst. U. S. Atty., Pittsburgh, Pa. (Gustave Diamond, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before KALODNER, FREEDMAN and SEITZ, Circuit Judges.

SEITZ, Circuit Judge.

Jerry Miles, Wilbert Vaughn and George Kirby (appellants) were charged with the armed robbery of the Eureka Savings and Loan Association of Pittsburgh, Pennsylvania, in violation of 18 U.S.C.A. § 2113(a) and (b). Appellants here challenge the judgments of conviction and the sentences of imprisonment which followed jury verdicts of guilty at their joint trial.

Each of the appellants contends that the district court erred in permitting the United States to plead surprise and to cross-examine and impeach two government witnesses, Arletta Edge and Delores Key.

In its case-in-chief the United States called Arletta Edge who had previously given a statement to the Pittsburgh Police and the FBI implicating each of the appellants in the bank robbery. The witness was the girl friend of the appellant Miles. Before the trial Miss Edge indicated to the United States Attorney that she repudiated her statement. Notwithstanding the repudiation, the United States called the witness, arguing that it believed that she would re-adopt her previous statement when under oath and in a courtroom setting.

When called to the stand, Arletta Edge testified that she and the appellant Miles had driven to New York from Pittsburgh in a hired car on the evening of October 29, 1965, two days after the robbery, that they were accompanied by the appellant George Kirby and Delores Key, and that upon arriving in New York all four of them registered at the Chesterfield Hotel. The witness then went on to state that while at the hotel, where the foursome stayed for about a week, Kirby visited Miles in the room which she and Miles were occupying. The prosecutor then asked whether she had overheard any conversations between Miles and Kirby. She replied that she had not.

At this point in his examination the prosecutor claimed surprise and asked leave to cross-examine and impeach the witness by referring to the statement which she had earlier given the Government, in which statement she claimed to have overheard Miles and Kirby discussing the bank robbery. Thereupon the court adopted the suggestion of the attorney for appellant Kirby that before the court ruled, it would be appropriate for the Government to interrogate the witness on voir dire.[1] In the course of

---

1. This desirable procedure permits an examination of the witness without prejudicing the parties or otherwise tainting the trial. At the same time, it affords the district court an opportunity to define the scope of the subsequent impeachment examination, if any.

the voir dire the witness declined to adopt any significant portion of the statement. She explained that she had signed the statement only in response to police coercion. The Government renewed its motion to permit impeachment and the court, over objection, permitted the Government to repeat the examination before the jury.

When proceedings recommenced before the jury, the prosecutor asked the witness whether she had given a statement to the authorities concerning the robbery. She replied that she had no knowledge of the robbery. Then, as was done on voir dire, the prosecutor showed her a copy of her statement. After the witness identified her signature and initials, the prosecutor interrogated her on her statement, proceeding through it line by line. The statement placed the appellants together on the day of the robbery and credited Miles and Kirby with "talking that they had robbed the bank." ·

At the close of the case, the trial judge instructed the jury that the out-of-court statement of the witness Arletta Edge was not to be considered as evidence against the appellants, but solely as matter which would bear on their evaluation of her credibility.

The United States takes the position[2] that surprise was properly pleaded and that the scope of the examination was proper because the witness "not only ·testified in a manner contradictory to an earlier sworn statement but, unsolicitedly and in the expectation of being confronted with her signed statement, assailed the police and FBI as having forced her to give that statement." The Government says that "[u]nder these circumstances, to have allowed this testimony to go unchallenged, would have permitted an outrageous distortion of the Government's presentation, to its serious detriment."

We find that the impeachment of Arletta Edge was improper in scope and inexcusably prejudicial to appellants.

■■ The United States may properly claim surprise and impeach its own witness by use of an out-of-court statement where (1) the witness' testimony was contrary to that which had been anticipated and (2) where the testimony was actually injurious to the Government's case. Bushaw v. United States, 353 F.2d 477 (9th Cir. 1965) cert. den., 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966), 1 Underhill's Criminal Evidence, Chapter 21, § 232, 1968 Supplement. However, the impeachment examination must be reasonably calculated to rehabilitate the Government's case without unnecessarily prejudicing the defendants. Culwell v. United States, 194 F.2d 808 (5th Cir. 1946). In making these determinations, the district court quite naturally exercises a certain amount of discretion.

■ We have no doubt that the United States was free to call Arletta Edge in expectation of eliciting from her material generally helpful to the Government and in expectation—or perhaps merely in hope—that she would repeat the subject matter of her sworn out-of-court statement. However, the voir dire examination made clear that she would in nowise ratify her statement and would persist in her repudiation of it. Indeed, she labelled it a product of police coercion. The United States therefore had full cognizance of her hostility when it elected to replay the voir dire examination before the jury. In these circumstances, the Government cannot now justify the scope of the impeachment examination by relying on testimony which it knowingly invited.

■ Up to the point where the jury was removed for the voir dire, the only testimony given by Arletta Edge which differed from her signed statement was that she had "failed to recall" having

2. In its brief the United States suggests that the appellant Vaughn does not assign error in the impeachment of Arletta Edge. We cannot understand the Government's

statement in light of the very clear presentation of the point in the joint brief of appellants Vaughn and Kirby.

overheard any conversations of substance between appellants Miles and Kirby. Even assuming that such testimony came as a surprise to the United States, there had been no affirmative prejudice or injury up to that point in the presentation of the Government's case. See Bushaw v. United States, supra, 353 F. 2d 481. The fact that she would not testify in all particulars as the Government had hoped is not to say that the Government was injured. Moreover, the transcript of the trial testimony given before the interruption for the voir dire reveals that material favorable to the Government was in fact elicited from this witness.

If we assume the propriety of some impeachment examination, the facts here in any event did not justify the Assistant United States Attorney's reading the prior statement line by line in the presence of the jury. United States v. Block, 88 F.2d 618 (2nd Cir. 1937). The examination, as it was conducted, was hardly designed to undo whatever affirmative harm had been done without unreasonably prejudicing the defendants. On the contrary, it appears to have been calculated to affirmatively aid the Government in establishing appellants' guilt. Further, we are unable to say that the court's cautionary instruction, to consider the statement as impeachment material only, adequately dispelled the prejudicial effect of the Government's line-by-line reading of the statement.[3]

■ Appellants also contend that the Government's impeachment of Delores Key, was improper and prejudicial. The material facts surrounding the impeachment examination of this witness are not unlike those reviewed in connection with the impeachment of Arletta Edge. Delores Key had given a statement to the Pittsburgh Police and the FBI incriminating the appellants. Subsequently, she repudiated the statement as containing false information fabricated and inserted by the authorities. The repudiation came at Grand Jury proceedings which preceded the trial below. Notwithstanding this preview of her hostility, the United States called Delores Key, and after eliciting substantial testimony generally helpful to its case, the United States sought to interrogate her on the subject matter of her out-of-court statement. Then, claiming surprise at her repudiation, it sought to impeach her by a line-by-line examination on her statement. The United States now seeks to justify the examination, its scope and the procedure followed on the same grounds as urged with regard to the impeachment examination of Arletta Edge.

Whether or not the United States should have had some opportunity to impeach this witness, we do not decide; because, it is clear that the examination, as conducted, was impermissibly broad and inexcusably prejudicial.

There is no question that the impeachment of Arletta Edge was prejudicial to Miles and Kirby and that in the circumstances of this case, it was prejudicial also to Vaughn. Further, we have concluded that the portions of Delores Key's statement read before the jury were prejudicial to the appellants, especially to Vaughn whom—according to the repudiated statement—this witness was to provide with a false alibi.

Having found that the improper proceedings in connection with the impeachment of Arletta Edge and Delores Key were materially prejudicial to all three appellants, we feel compelled to set aside their convictions.

3. Although we note the swell of comment attacking the orthodox and generally followed rule that extra-judicial statements of witnesses can only be used for impeachment, we do not decide whether the prior statement here could have had any substantive effect. See United States v. Schwartz, 390 F.2d 1, 4 (n. 6) (3rd Cir., 1968). We say this because at the trial the United States explicitly limited its use of the statement to impeachment. To give the statement direct probative weight here would be particularly unfair, since appellants' counsel elected not to cross-examine Arletta Edge and they might have exercised a very different judgment were they advised that the statement was to be used for more than impeachment purposes.

Two of the appellants raise another issue which we feel should be resolved in order to aid the district court in subsequent proceedings. During the course of its case, the United States offered into evidence two $5 bills found in the search of the appellants, Miles and Kirby. The bills were identified as a part of the "bait money" taken during the robbery.

At a pre-trial suppression hearing Miles and Kirby moved to suppress the bills as evidence on the ground that they were seized unlawfully. Their motion was denied, and the bills were introduced into evidence. They again urge that the introduction of the bills was prejudicial error.

The essential facts surrounding the seizure are not in dispute. At approximately 4:15 p.m. on the afternoon of November 9, 1965, Detective Daly of the New York Police Department received the following message from the New York Correspondence Unit:

"* * * two men were wanted for armed robbery of the Eureka Savings and Loan Association in Pittsburgh, Pennsylvania of $11,000. This information was gotten from Sargeant Tercsak in the Robbery Squad of Pittsburgh. They were staying at the Hotel Chesterfield, 130 W. 49th Street, Room 1255. [The Correspondence Unit] then gave us the name George Kirby, AKA Williams.

"A male negro, forty years of age, five feet eight, brown skin. Jerry Miles, male negro, thrty-one (sic) five feet eleven, dark skin. * * * [T]hey were both addicts with tracks. They were both armed and considered dangerous, and [the Pittsburgh Police] have warrants."

Upon receiving the message, Detective Daly and three other police officers went to the Hotel Chesterfield, where, after conferring with hotel personnel and determining that the appellants were not in, they illegally secured entrance to Room 1255 (the evidence so se-cured was suppressed by the district court). The detectives then left the room and continued their surveillance of the hotel. At about 9:30 p.m. two men answering the descriptions of the appellants Miles and Kirby entered the hotel lobby. The police officers immediately seized the two men and ushered them into a nearby stairwell, where a cursory search was made. No weapons were found but a large "wad" of currency was removed from Kirby's left rear pocket and a smaller bundle from his left front pocket. The money was immediately replaced. The officers then hand-cuffed these two appellants and in the company of hotel personnel the officers marched them up twelve flights of stairs to Room 1255.[4] The officers entered the room, and searched it and the two appellants again. Nothing was found which had not already been discovered, and the money in Kirby's pockets was not removed.

The police and the two appellants then headed back down the stairs and over to the police station, roughly some three blocks from the hotel. The appellants were put into a lock-up. Shortly thereafter, Kirby was taken into an interrogation room where the money which had been previously found in his pockets was removed and counted. The procedure was then repeated with Miles. All of the money was placed in the Property Clerk's Office, and subsequently turned over to the Pittsburgh authorities. Although the record is not clear on this point, apparently the $5 bills, which were introduced at the trial as a part of the "bait money," were not discovered until the Pittsburgh authorities examined the money.

At the suppression hearing, the district court ruled that the seizure of the money was incidental to a lawful arrest. For the reasons we shall now develop, we agree with this determination.

The two appellants contend that (1) the arrests were unlawful and (2) even

---

4. They had to walk because the hotel elevators were not working as a result of the power failure which blacked out much of the East Coast.

if lawful the seizure was not incidental to them. As to the first contention, they claim that the arrests were unlawful whether made on the basis of the warrants issued in Pittsburgh or on the basis of New York charges preferred against the appellants.

■ With regard to the Pittsburgh warrants issued prior to the arrest on November 9, 1965, it is argued that because the warrants were defective in Pennsylvania (not having been issued on affidavit) they could have no more validity in New York. Whatever merit appellants' contention may have, it does not compel the conclusion that the arrests in New York were unlawful. Unquestionably, a police officer in one jurisdiction may arrest without a warrant a fugitive from another jurisdiction so long as the arresting officer has probable cause to make the arrest and the arrest is lawfully effected in the jurisdiction where it is made. Stallings v. Splain, 253 U.S. 339, 341, 40 S.Ct. 537, 64 L.Ed. 940 (1920).

■ Since the arrest was made in New York, the question that presents itself is whether a warrantless arrest for an out-of-state felony is legal under New York law. Admittedly the offense that the appellants were charged with was a felony under Pennsylvania law as well as federal law. 18 Purdon's Stat. Ann. § 4705; 18 U.S.C.A. § 2113(a). New York law is clear that a warrantless arrest for such a felony is permissible, if based on probable cause. New York Code of Criminal Procedure § 177. See Burton v. New York Central R. R. Co., 147 A.D. 557, 132 N.Y.S. 628 (App.Div.2d Dep't. 1911), aff'd. per curiam 210 N.Y. 567, 104 N.E. 1127 (1914), aff'd., 245 U.S. 315, 38 S.Ct. 108, 62 L.Ed. 314 (1917).

Indeed, the appellants make no suggestion that the information transmitted to New York was not sufficient to give Detective Daly probable cause to arrest the appellants for the robbery of the Eureka Savings and Loan Association. They do not urge that the information was somehow deprived of its vitality by passing through the chain of communication outlined above. Nor do the appellants challenge the sufficiency of the factual data possessed by the Pittsburgh authorities.[5]

■ As to their second contention, appellants argue that the seizure at the police station was not incidental to the arrests because it was made approximately one hour after the arrests and initial search in the hotel stairwell and at a location some three blocks from the hotel, the place of the arrests. A warrantless search and seizure incidental to a lawful arrest, must be "substantially contemporaneous with the arrest and * * * confined to the immediate vicinity of the arrest" in order to be lawful but the application of the test depends on the circumstances of the individual case. Stoner v. California, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L. Ed.2d 856 (1964); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L. Ed.2d 777 (1964).

The pertinent facts surrounding the search and seizure in our case are as follows. As stated earlier, there was an electric power failure the night of the arrest. Thus, as the testimony at the suppression hearing revealed, the appellants were arrested in a candlelit and crowded hotel lobby, they were given a cursory search in a darkened hotel stairwell and a second search in the close quarters of a dark hotel room. These conditions hardly permitted the careful

---

5. At the suppression hearing Detective Giorgianni testified:

"I told the magistrate that I wanted to get warrants for those two subjects for various reasons. They were identified by one of the victims of the bank, and both defendants were seen about an hour before by a couple of our other detectives prior to the robbery, and their fleeing to New York under an assumed name, and their registering in the Alice Hotel under an assumed name and trying to go to New York. And also finger prints were found in an automobile of a third subject, the car they were seen in prior to the robbery."

and thorough search that would have been desired and which the surroundings of the police station later afforded. In these circumstances, it was entirely proper for Detective Daly to confiscate at the hotel only those items which could prove dangerous, leaving the removal of the other items until the arrival at the police station. United States v. Frankenberry, 387 F.2d 337, 339 (2d Cir. 1967).

 We therefore conclude that the seizure was incidental to the arrests and that it was not error to admit the $5 bills into evidence at the trial.

 Appellant Vaughn claims that the Government's evidence connecting him with the robbery was insufficient to raise a jury issue. We have reviewed the record and conclude that there was sufficient evidence to submit his case to the jury.

The other assignments of error urged by the appellants have been considered and found to be without merit.

For the reasons stated, the judgments of conviction will be set aside and new trials granted.