**UNITED STATES of America,**
**Appellee,**

v.

**Fred A. CUNNINGHAM and Rudolph J.**
**Trumpler, Defendants-Appellants.**

**No. 987, Docket 35792.**

United States Court of Appeals,
Second Circuit.

Argued June 11, 1971.

Decided July 15, 1971.

Jon A. Sale, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D.N.Y., Rudolph W. Giuliana and Jack Kaplan, Asst. U. S. Attys., of counsel), for appellee.

Pierre N. Leval, New York City, for appellant Trumpler.

Gabriel B. Schwartz, New York City, for appellant Cunningham.

Before FRIENDLY, Chief Judge, and HAYS and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

This appeal from a judgment of the District Court for the Southern District of New York, convicting Fred A. Cunningham and Rudolph J. Trumpler, after a verdict, of bank robbery in violation of 18 U.S.C. § 2113(a) and assault during its commission in violation of 18 U.S.C. § 2113(d), again raises the question of what the prosecution may properly do when a witness who was expected to give favorable testimony denies having knowledge of the facts and having previously made a statement that he did.

The Government proved that on the morning of July 28, 1970, two men entered a branch of the First National City Bank at 565 West 125th Street in New York City. One of them, armed with a sawed-off shotgun, disarmed a guard, grabbed the latter's revolver, and offered a bank official who was talking on a telephone the alternatives of dropping the phone or having his brains blown out. The other man, carrying a paper bag, vaulted over a teller's counter, took $7,580 in cash from the teller's drawer, and jumped back. Both men then ran away.

During the course of the robbery, a bank official had activated surveillance cameras. It is clear from the testimony that five pictures unmistakably identified defendant Rudolph Trumpler, the man with the gun. In contrast the only picture claimed to show Cunningham was too blurred to have substantial probative value. Four bank employees positively identified Trumpler; only one

identified Cunningham,[1] although others gave general descriptions of a physique which resembled his.

It is in this setting that we come to what is claimed to be error requiring reversal. The Government called as a witness, Roger Trumpler, Rudolph's brother. The prosecutor asked how often Roger had seen his brother and Cunningham together during July; he answered "Maybe twice. Maybe three times." The prosecutor then was allowed to inquire whether Roger remembered that, when asked before the grand jury, "Do they see each other often?", he had answered "Yes, you know, hang around." Objection was made and a conference was held in the robing room. The Assistant United States Attorney represented he had been surprised and was given permission to examine Roger as a hostile witness. When the question was repeated, Roger admitted having given the answer about hanging around, but pointed out that he had said nothing about the date. After some further questions unnecessary to detail, the following interrogation ensued:

Q. Do you remember, sometime after July 28, overhearing a conversation between your brother and Fred Cunningham about splitting up a large sum of money, how they were going to split up a large sum of money? Do you remember that conversation? A. No.

Q. You have absolutely no recollection of that conversation? A. I don't remember the conversation.

Q. Could it have taken place? A. I don't know.

Q. Do you remember on August 13, 1970, telling Agent Swayze, Agent Jones and Detective Williams that you overheard such a conversation? A. No.

Q. You don't remember that? A. I remember. I never told them such a thing.

Q. You are saying now that you are absolutely certain you never told them? A. Yes, because I don't remember. I couldn't tell them something that I couldn't remember. I'm positive of that.

Q. Could it have been possible that you remembered that conversation then and don't remember it now? A. I don't understand the question.

Q. Could it have been possible that at that time you remembered that conversation between your brother and Cunningham about splitting up money back on August 13, but since then you have forgotten it? A. To my recollection, I don't remember any such conversation.

Q. You don't remember telling the police officers about it, and the FBI agents? A. I know I didn't tell them about this.

Q. You are absolutely certain of that? A. I am positive I didn't tell them anything about it.

No specific objection to this was made.

Later in the day Agent Swayze was on the stand. After he had testified on other subjects, the prosecutor asked:

Now, referring also to August 13, 1970, did Roger Trumpler have a conversation with you about his brother and Cunningham splitting up money?

Before objection could be made, the agent answered "Yes." When the objection was made, it was immediately sustained. The judge added, "I am going to strike the testimony of Roger Trumpler when he was asked questions by the prosecution about whether or not he had told this agent anything with respect to the division of the money." In the course of his charge, Judge Weinfeld

---

1. This employee said he could "not really" identify the photograph of a man vaulting over the counter but could identify the person, to wit, Cunningham. After thorough cross-examination he reaffirmed that he had no doubt about the identification.

told the jury that any testimony he had stricken was not to be considered "in the slightest degree" and, at the request of Cunningham's counsel, added a specific reference to the testimony of Roger Trumpler.

■■ The Government was entitled to impeach Roger's testimony that he had seen Rudolph and Cunningham together only two or three times by showing he had previously made statements concerning more frequent meetings. United States v. Kahaner, 317 F.2d 459, 473–474 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). For, despite defense counsel's suggestion that the prosecutor's claim of surprise was contrived, we regard Roger's acknowledgment that Cunningham and his brother saw each other often and that they "hang around" as indicating more than merely "twice [or] three times" during a month. It was likewise entitled to ask Roger, quite apart from any question of impeachment, whether he had overheard the statement between Rudolph and Cunningham about splitting up a large sum of money after the robbery. When he denied this, it was proper for the Government to endeavor to "refresh" his recollection by reminding him of his alleged statement to Agent Swayze, Agent Jones and Detective Williams or, indeed, since this was embodied in a report, Government Exhibit 3502 for Identification, by showing the report to him and asking him to read it. See Taylor v. Baltimore & Ohio R. R., 344 F.2d 281, 283 (2 Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 72, 15 L. Ed.2d 75 (1965). The questions propounded to Rudolph did not go beyond this; there was nothing like the extensive reading of prior testimony which Judge L. Hand, evidently to his own unhappiness, found legally offensive in United States v. Block, 88 F.2d 618 (2

Cir.), cert. denied, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed.2d 1347 (1937).[2]

■ On the other hand, the prosecutor's interrogation of Agent Swayze was clearly improper. It did not constitute allowable impeachment since, as we observed in Taylor, supra, 344 F.2d at 283–284, quoting from Kuhn v. United States, 24 F.2d 910, 913 (9 Cir.), modified on other grounds on rehearing, 26 F.2d 463, cert. denied sub nom. Lee v. United States, 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533 (1928), "[t]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised," and "where the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment. * * *" See also United States v. Miles, 413 F.2d 34 (3 Cir. 1969). If the question was intended to elicit an answer that could be used as affirmative proof, it falls within the ban of Bridges v. Wixon, 326 U.S. 135, 150–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); indeed, the facts are less favorable to the Government than in that case since there the prior statements had been stenographically recorded. While, beginning with United States v. De Sisto, 329 F.2d 929, 933 (2 Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L. Ed.2d 747 (1964), we have allowed certain prior inconsistent statements of a witness available for cross-examination to be received as affirmative proof, we have rigorously limited this to sworn testimony at a former trial or before a grand jury.[3] United States v. Mingoia, 424 F.2d 710, 713 (2 Cir. 1970); United States v. Insana, 423 F.2d 1165, 1170 (2 Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). The risk of

2. See the discussion of this and other Second Circuit cases of the period in Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L.Rev. 177, 193–94 (1948).

3. Professor Chadbourn, referring to this as "the Second Circuit view," has noted "the carefully marked boundaries which limit it." 3A Wigmore, Evidence § 1018, at 997–98 (Chadbourn rev. 1970).

going further is illustrated by this case where, in addition to the dangers against which the hearsay rule is meant to protect, the issue whether the declarant ever made the statement requires resolution of a swearing contest between himself and the police.

■ It is true that Roger's alleged statement would be admissible under Rule 801(d) (1) of the Proposed Federal Rules of Evidence, reproduced in 51 F. R.D. at 413. It is likewise true that Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222, (1971), might well be taken as holding that, under the circumstances of this case, such admission would not violate the confrontation clause of the Sixth Amendment although we recognize that *Nelson* may be distinguishable on the ground that there the declarant, whose out-of-court statement implicated the respondent (the declarant's co-defendant), proceeded to testify favorably to the respondent concerning the underlying facts, a factor upon which the Court in part relied. 402 U.S. at 629, 91 S.Ct. 1723. But there is no rule that anything should be admitted as evidence that constitutionally can be. Our guide is still "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience," F. R.Cr.P. 26. We are not ready to assume that the Supreme Court will overrule Bridges v. Wixon, *supra*, by adopting the proposed rules, which it has returned for further consideration by the Committee on Rules of Practice and Procedure; [4] in any event it has not yet done so. Neither, unless and until the proposed rules become effective, will we go beyond our own previous decisions on the subject. The question asked Agent Swayze was not allowable under any principle of evidence.

This, however, does not end the case. Judge Weinfeld immediately recognized the impropriety of Swayze's quick answer and took every corrective action that was possible. Not suggesting anything more the judge could have done, appellants contend the damage was irreparable.

The question how far curative instructions can really cure requires an appraisal of all the circumstances. We start from the fact that, in contrast to the reading of pages of prior testimony in United States v. Block, *supra*, 88 F.2d at 619, in United States v. Miles, *supra*, 413 F.2d at 37, or in United States v. Fiore, 443 F.2d 112, 114 (2 Cir. 1971), (where no curative instruction was given), the objectionable testimony here related to a single statement. Moreover, in contrast to United States v. Block, *supra*, where "the defendants continually protested and were uniformly overruled," the judge acted immediately and repeated his ruling twice thereafter. It seems far more likely that the jury would have been influenced by the implicit rebuke to the prosecutor than that it would have disregarded the instructions thrice given.

■ To warrant reversal under these circumstances there must at least be a serious basis for belief that a verdict rested on failure by the jury to heed the judge's instructions. *See*, e. g., Frazier v. Cupp, 394 U.S. 731, 735–736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Wapnick v. United States, 406 F.2d 741, 742–743 (2 Cir. 1969); United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1058–1059 (2 Cir. 1970). With respect to Trumpler, there is clearly no ground for such a belief. The photographs and the identification testimony eliminated any possibility of reasonable doubt of his guilt, at least in the absence of strong

---

4. Unhappily the Committee has not seen fit to publicize the rules as finally submitted to the Supreme Court or invite comment thereon in a manner likely to attract attention. So far as we are aware, in marked contrast to the original submission, the revised rules can readily be found only in a preface to No. 3 of the Advance Sheets to 437 F.2d, dated April 12, 1971, and in volume 51 of the Federal Rules Decisions, page 315 et seq. The deadline for further comments is August 1.

contrary proof on his part. All that he offered was his own uncorroborated testimony that, as a heroin addict unemployed for several years, he had spent the day of the robbery in bed, "high as a mink stole"—perhaps not the most fortunate word for use under the circumstances.

The question with respect to Cunningham is closer. The photograph was blurred, and the identification testimony, while certainly sufficient, was not so overwhelming as with respect to Trumpler. His principal defense was that about two months before the robbery, he had suffered a broken ankle, and that his leg had been put in a cast, which hospital records established, and that he consequently could not have performed the vaulting feats performed by the second participant.[5] The Government countered by showing that the cast was scheduled to be removed at the hospital 18 days before the robbery, but offered no records to prove that it had been. Cunningham claimed it had not been and that he had taken it off himself one or two weeks after the robbery; his own medical witness, however, testified that the usual procedure for removing a cast was by use of a "reciprocating" or "cast-touching" saw and that this was usually done in a hospital or a doctor's office. This witness testified, on the basis of the hospital records, that it would have taken Cunningham three months to recover completely and that it was unlikely that within two months he would have been able to perform the activities described by the bank employees "in a normal manner and be able to put weight on * * * this extremity [the ankle], in a normal manner at that time." However, the doctor did not say that it would have been impossible for Cunningham to have done this, at the cost of some discomfort. Moreover, Cunningham conceded he had played basketball 16 days after the robbery "to loosen the ankle up a little bit." He claimed that he spent the day of the robbery in or near the apartment of a woman with whom he was living, and she also testified. However, it was clear that she had no specific recollection concerning Cunningham's activities on the precise day, and her testimony thus was of little value to the defendant.

The Government relied also on some additional evidence. One item did add significantly to the prosecutor's case; the other boomeranged. Cunningham had known Trumpler for 15 years, was frequently seen with him during the period before and after the robbery, and was with Trumpler, in the latter's apartment, on the day of their arrest. Yet, when shown two of the surveillance photographs, including the excellent likeness of Trumpler, he said he did not recognize either of the robbers which, as to Trumpler, almost certainly was a lie. The Government sought to show, through a New York City detective, that when Cunningham saw an FBI "wanted" poster on the station-house bulletin board displaying one of the surveillance photographs depicting the two men, he attempted to flee. It turned out that the detective had no personal knowledge but had apparently misled the prosecutor into thinking he had. The detective who had actually observed Cunningham described his behavior in a way negating any intention to flee. The judge struck the testimony of the first detective and specifically instructed the jury there was no evidence of any attempt at flight. We agree with the United States that, "this testimonial contretemps was far more embarrassing to the Government than harmful to the defense."

In the final analysis, as Judge Weinfeld pointed out in his charge, "[t]he hard core of the case is the issue of identification. The case stands or falls on it." The identification evidence with respect to Cunningham while not overwhelming was surely sufficient, and the case thus turned on the jury's evaluation of the credibility of the eye-witnesses and of Cunningham and the wom-

---

5. The photograph shows that the vaulter was not wearing a cast.

an with whom he lived. Hence, all things considered, we are not persuaded that what we regard as the exceedingly slight chance that the jury failed to pay proper heed to the court's explicit instructions to disregard any testimony about the incriminating conversation between Rudolph Trumpler and Cunningham justifies our directing a new trial for the latter, although the trial judge, with his intimate feel of the case, had in effect refused this in denying Cunningham's motion for a mistrial.

Affirmed.

OAKES, Circuit Judge (concurring in part and dissenting in part):

I concur as to the defendant Trumpler, since proof of his guilt was so conclusive. I dissent as to the defendant Cunningham, and would reverse and remand as to him.

The interrogation of Agent Swayze was clearly improper both in substance, Taylor v. Baltimore & Ohio Railroad Co., 344 F.2d 281, 283–284 (2d Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965), and in form.* See generally Bridges v. Wixon, 326 U.S. 135, 150–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). Here we have an inconsistent unsworn oral statement, as in United States v. Fiore, 443 F.2d 112 (2d Cir. 1971), not prior sworn testimony as in United States v. Mingoia, 424 F.2d 710, 713 (2d Cir. 1970) or United States v. Insana, 423 F.2d 1165, 1170 (2d Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 16 (1970).

Proposed Rule 801(d) (1), 51 F.R.D. at 413, permitting this kind of interrogation, will hopefully be reconsidered, since here is a case where the rule's abuse is evident. The curative instructions, however well-intentioned, cannot have erased from the jury's minds this terribly damaging evidence of plans to divide the proceeds which tied defendant Cunningham to the obviously guilty defendant Trumpler. It was hearsay of

the worst variety, incapable of being countered by direct evidence. In such a case curative instructions are futile. See United States v. DeSisto, 329 F.2d 929, 933 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964).

Accordingly, in my view there was prejudicial error as to appellant Cunningham.

---

* By its leading nature, indicating perhaps an overzealous prosecutor's attempt to do the damage whether the question was answered or not.