UNITED STATES of America, Appellee,

v.

Joseph Francis CARUSO, Defendant-Appellant.

No. 917, Docket 72-1553.

United States Court of Appeals, Second Circuit.

Argued July 19, 1972.

Decided Sept. 5, 1972.

Sheila Ginsberg, New York City (Robert Kasanof, The Legal Aid Society, New York City, on the brief), for appellant.

Joseph Jaffe, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., John W. Nields, Jr., Asst. U. S. Atty., on the brief), for appellee.

Before FEINBERG, MULLIGAN and OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

Appellant Joseph Caruso was found guilty after a jury trial in the United States District Court for the Southern District of New York, Lloyd F. Mac-Mahon, J., of possession of 100 counterfeit $10 bills and of passing and attempting to pass eight counterfeit $10 bills. 18 U.S.C. §§ 472 and 2.[1] His sole claim on this appeal is that he was improperly cross-examined by the prosecuting attorney about alleged prior inconsistent statements. For reasons given below, we affirm.

The Government's evidence at trial overwhelmingly established the following: On January 6, 1972, appellant and a man named Donnie met Roland Burgess at a tavern in Manhattan and agreed to buy from Burgess $1,000 in counterfeit bills for $300 in real money. The exchange was made later that day at a bar in New Jersey. By this time Arthur Sharkey had joined appellant and Donnie at the bar and it was agreed that Sharkey and appellant would try to pass the counterfeit $10 bills. Acting on this plan, the two returned to New York where, after trying unsuccessfully to use the bills at a well-lighted bakery, they headed for Greenwich Village where they thought the lighting would be more suitable. There they visited several places, including a bar and a restaurant, where they succeeded in buying drinks with the counterfeit money. But the owner of the restaurant, understandably suspicious when he observed that appellant and Sharkey bought drinks without finishing them, examined the money given him and went next door to compare bills with the bartender at the bar. Realizing that they had been given counterfeit money, the two notified an off-duty policeman, Michael Reddy, who then arrested appellant in a nearby restaurant.

Appellant's claim on this appeal concerns certain questions asked him on cross-examination. The Government attempted to impeach appellant by asking him whether he had made self-incriminating statements to Assistant United States Attorney Cullen MacDonald. When appellant admitted having had an interview with MacDonald but claimed that he was unable to remember everything that was said, the government attorney gave appellant a document to read to "refresh" his recollection. That document, which had been marked for identification as Government Exhibit

---

1. Appellant was sentenced as a young adult offender for treatment and supervision pursuant to 18 U.S.C. § 5010(b) until discharged by the Federal Youth Correction Division of the Board of Parole as provided in 18 U.S.C. § 5017(c).

3504 but had not been offered in evidence, contained MacDonald's notes of his interview with appellant. When appellant still expressed loss of memory, the prosecutor proceeded to paraphrase and quote from the report and ask appellant whether in fact he had made such statements. At one point the government attorney asked "Mr. MacDonald made that up and wrote it down?" Appellant denied having made any of the statements.

Appellant claims that the effect of these questions, which are reproduced in the margin,[2] was to improperly place before the jurors the report of MacDonald, who was not a witness at the trial. Appellant further argues that, besides resulting in the introduction of inadmissible hearsay, the manner in which the report was used also served improperly to accredit Secret Service Agent Albert Angelone, who had previously testified for the Government that appellant had made such a statement to MacDonald.

The Government contends that all the questions asked appellant except one constituted legitimate attempts by the

2. The questions objected to are contained in the following excerpt:

Q. Do you remember being in Mr. MacDonald's office on the 7th, the Assistant United States Attorney, on the 7th at about 12:30?
A. Yes, sir.
Q. You were there?
A. Right.
Q. Do you remember he advised you of your rights?
A. Yes, sir.
Q. You remember he told you that you were charged with counterfeiting in violation of Section 472?
A. I don't remember everything.
Q. Well, I will show you Exhibit 3504. See how much your recollection is refreshed.
Have you read the first page of 3504?
A. Yes, sir.
Q. Does that refresh your recollection of what Mr. MacDonald told to you and you said to him with regard to your constitutional rights?
A. Yes, sir.
Q. Now, do you remember what you said to Mr. MacDonald about your involvement with counterfeit money?
A. No, I don't remember.
Q. Well, turn to page 2 of that exhibit. Without reading it to the ladies and gentlemen of the jury see whether it refreshes your recollection. Does it?
A. Excuse me, I didn't hear the question. What was the question?
Q. Having read page 2 of Exhibit 3504, do you now remember what you told Mr. MacDonald?
A. No, sir, I don't remember.
Q. Is it your testimony that you never said to Mr. MacDonald you saw a friend in the tavern and that you want to leave him out because he is only the middle man, he paid the money, "We got it"?

A. It is my—what is the question, is it my testimony?
Q. The question is do you say—your testimony now that you never told Mr. MacDonald, "I seen my friend in the tavern, I want to leave him out, he is only a middle man, he paid the money, we got it"? You never said that?
A. No, sir.
Q. Mr. MacDonald made that up and wrote it down?
A. I don't know who write it down.
Q. Do you remember you told Mr. MacDonald "Some guy—I don't recall his name—we paid, delivered to us in Jersey City, We went out—me and Sharkey—and tried to pass the money, and that was it, the place where he worked on Ninth Avenue between 33rd and 34th, this is the first time with counterfeit"? You never said that either?
A. I don't understand the question.
Mr. Jaffe: Mr. Reporter, read back that last section as to what he said to Mr. MacDonald.
(Read.)
Q. Is it your testimony you never said those words?
A. I never said it.
Q. You never said that? Did you tell Mr. MacDonald after you read this thing that you would rather not sign it?
A. I told him, "No, I won't sign it."
Q. Well, before you told him, "No, I won't sign it," you must have read it, didn't you?
A. I don't remember.
Q. You don't remember whether you read it, but you are sure you didn't say it; is that your testimony?
A. I didn't say it.

prosecuting attorney to impeach appellant's testimony by challenging him with prior inconsistent statements of guilt. The exception is the question "MacDonald made that up and wrote it down?", which the Government admits was objectionable because "there was no evidence in the record that Exhibit 3504 contained MacDonald's notes of the interview."[3] The Government argues, however, that no objection was taken to this question, nor indeed to any of the questions now challenged, and that in any event appellant was not seriously prejudiced by the error.

We find it unnecessary to consider whether appellant's claims are valid. For even assuming arguendo that it was improper for the government attorney to attempt to impeach appellant by quoting from MacDonald's report so extensively and to ask the question which the Government concedes—albeit for a different reason—was improper, compare United States v. Puco, 436 F.2d 761 (2d Cir. 1971), and United States v. Block, 88 F. 2d 618 (2d Cir.), cert. denied, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347 (1937), we view the errors as harmless.[4] As indicated at the outset of this opinion the evidence of appellant's guilt was massive. Sharkey and Burgess, who were indicted along with appellant but pleaded guilty before trial, testified for the Government as to appellant's involvement in the purchase and passing of the counterfeit notes. Both the restaurant owner and bartender also identified appellant as one of the two men who passed counterfeit bills in their businesses on the night of January 6. Reddy, the

off-duty policeman who arrested appellant, testified that he conducted a search incident to arrest of appellant and found eight counterfeit bills in his pocket. He further testified that appellant admitted having more counterfeit money in his car, which Reddy found in a subsequent search. Buttressing all this evidence was the testimony of Secret Service Agent Angelone that appellant had confessed to the crimes on two occasions shortly after his arrest—once in an interview with Angelone and later in the very interview with MacDonald at which Angelone was present. Finally, Secret Service Agent Guy Caputo, an undercover agent, testified that he had arranged with appellant to meet Burgess in order to purchase counterfeit money. Against this evidence appellant's sole defense was his denial on the stand that he was knowingly involved in any illegal use of counterfeit money.

Thus, the Government presented overpowering evidence of appellant's guilt. Moreover, since Angelone had already testified to the substance of appellant's self-incriminating statements to MacDonald, the Government's cross-examination of appellant did not put before the jury evidence of which they might otherwise have been unaware. Under such circumstances, we cannot say that "substantial rights" were affected here by the claimed error; nor do we believe that on this record we should exercise our discretion to "notice" the asserted "plain error," in the absence of objection below. See Fed.R.Crim.P. 52(b).

Judgment affirmed.

---

3. Government's Br. at 7.

4. It was, as defendant seems to concede, entirely proper for the prosecuting attorney to ask appellant whether he had made certain incriminating statements to MacDonald and, when appellant denied making them, to attempt to refresh his

recollection by giving him the report to read. See United States v. Cunningham, 446 F.2d 194 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971); Taylor v. Baltimore & Ohio R.R., 344 F.2d 281, 283 (2d Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965).