743 P.2d 1386

**STATE of Arizona, Appellee,**

v.

**John Thomas CARR, Appellant.**

**No. CR–86–0083–AP.**

Supreme Court of Arizona,
En Banc.

Oct. 1, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by James H. Kemper, John W. Rood, III, Deputy Maricopa County Public Defenders, Phoenix, for appellant.

MOELLER, Justice.

John Thomas Carr was tried and convicted for the first degree murder of Brent Laliberte. The trial judge found that life imprisonment, rather than death, was the appropriate sentence. Defendant appeals his conviction, contending that the trial court made two erroneous rulings on evidentiary issues. Each issue involves the admissibility of out-of-court statements, one by the defendant and one by a witness. Each statement was offered on the theory that it was admissible as an excited utterance. The trial court ruled that the witness's statement was admissible and the defendant's was not. We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3) and A.R.S. § 13–4031. Since we find no error, we affirm.

FACTS

A knowledge of certain basic facts is necessary in order to determine the admissibility of the two alleged excited utterances. On July 13, 1984, four days before the murder, Carr (defendant) was visiting a

friend at The Elms, a two-story apartment complex in Mesa, Arizona. Kevin Zufelt, another resident of The Elms, and one of his friends became involved in a heated argument with Laliberte, the murder victim, who was also a resident at The Elms. This argument arose over the use of the apartment's swimming pool. Defendant and others got involved in the confrontation. Defendant was overheard to say that he would get the victim, Laliberte, "some day, some way," or "one way or another."

Four days later, defendant again visited The Elms. The victim invited Zufelt and defendant to smoke some marijuana. The three men sat in front of the victim's ground-floor apartment until an argument erupted between defendant and the victim. Defendant stormed up to the second-floor balcony overlooking the victim's apartment. Zufelt followed him in an attempt to calm him down. While doing so, Zufelt unfortunately returned a buck knife to defendant from whom he had earlier borrowed it. Within minutes, this buck knife became the murder weapon. While Zufelt was trying to get defendant calmed down, defendant accused Zufelt of "kissing his [Laliberte's] ass."

Witnesses Tommy Masterson and Linda Bennett were also on the second-floor balcony where they had been watching an incoming storm. Defendant told them in a loud voice that the victim had accused Masterson of breaking some glass and not cleaning it up. Witness Masterson also tried unsuccessfully to calm the defendant. About this time, the victim, who was downstairs within earshot of defendant's loud accusations, challenged the defendant to come down to where he was and repeat his accusations. At that point, defendant said, "That's it," said he was going to "kill that s.o.b." and headed downstairs.

The victim was standing in front of his apartment with nothing in his hands and no weapon on his person. When defendant reached the victim, they began arguing, and the victim "poked" defendant. in the chest one or more times. Masterson, Bennett and Zufelt then saw the defendant "swing" at the victim, who then grabbed

his own neck and began falling away from the defendant. Defendant then stabbed the victim in the back. One witness heard the defendant state: "That will teach you," as he pulled the knife out of the victim's back.

An autopsy showed that the victim died as a result of stab wounds to the neck that slashed the carotid artery and completely severed the jugular vein. Another stab wound nearly fifteen inches long ran vertically from the back of his head through his shoulder blades and down his back. There were also defensive stab wounds on the victim's wrist and right forearm and additional stab wounds in his back.

Defendant immediately fled from the apartment complex after the attack. Numerous people, including Masterson and another Elms' resident, Greg Scyrkels, ran to help the victim. As Masterson and Scrykels futilely tried to staunch the massive flow of blood gushing from the victim's mortal neck wounds, Scyrkels heard Masterson say, "He (the defendant) said earlier when he was upstairs, that he was going to come down and kill him (the victim)." The admission of this statement as an excited utterance by Masterson constitutes the first alleged error raised by the defendant.

About forty minutes after the attack, the defendant returned to the apartment complex. Seeing that police officers and fire trucks were present, he concluded he had "messed up real bad" and fled again. However, the police officers gave chase and defendant was apprehended as he tried to hide under a nearby fence. While being transported to the police station, defendant contends he told one or more of the officers that the victim had threatened him with a shotgun. The trial court found this statement by defendant was not an excited utterance and refused to admit evidence of it. This is the basis for defendant's second assignment of error.

After arrival at the police station, defendant gave a statement after being "Mirandized." He said he went to the apartment complex to visit a friend and had a few harsh words with the victim. He said

the victim summoned him, began poking him in the chest, and told him he was going to "kick his ass." Defendant admitted he took the knife from its sheath and "took one slash at Brent [the victim] horizontally with his right hand."

In his trial testimony, defendant, who is black, claimed that he was afraid of the victim because he had seen the victim two or three weeks before the attack holding a shotgun and saying that it was for "nigger season." Defendant said he only attacked because he thought the victim was going to draw a weapon.

## THE STATEMENT OF THE WITNESS

The first claimed error concerns the admission into evidence of the statement Masterson made to Scyrkels immediately after the attack as the two of them were trying to save the victim's life. Scyrkels testified that the "tall guy with curly hair" [Masterson] stated at that time that the defendant had said "earlier when he was upstairs, that he was going to come down and kill him [Laliberte]." Over a hearsay objection, the statement was admitted under the excited utterance exception. Ariz.R.Evid. 803(2).

■ Masterson was available as a witness and testified. Masterson did not deny making the statement attributed to him by Scyrkels, but he testified that he had no memory of making the statement. However, even when the declarant is available as a witness, Rule 803(2) excludes from the hearsay rule any "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In reviewing fact situations involving the excited utterance exception, both before and after the formal adoption of it by promulgation of Rule 803(2), this court has used the three-part test laid out by Wigmore. *State v. Rivera*, 139 Ariz. 409, 678 P.2d 1373 (1984); *State v. Ritchey*, 107 Ariz. 552, 490 P.2d 558 (1971). First, there must be a startling event. Second, the words must be spoken soon after the event so that the declarant will not have time to fabricate the declarations. Third, the

words spoken must relate to the startling event. 6 Wigmore, *Evidence* § 1750 (Chadbourn rev. 1976).

The basic facts outlined above certainly show that a startling event occurred. Further, the statement related to the event and was made during it. The startling event began with the sudden eruption of a loud confrontation between the defendant and the victim. The startling event was still in progress a few minutes later when a statement about it was made by a witness who was desperately trying to staunch the massive flow of blood from the dying victim. The statement has all the indicia of reliability which has led to acceptance of the excited utterance rule. We will not reverse a trial court's ruling under the excited utterance exception absent a clear abuse of discretion. *State v. Rivera*, 139 Ariz. at 410, 678 P.2d at 1374; *State v. Dale*, 113 Ariz. 212, 216, 550 P.2d 83, 87 (1976). There was no such abuse of discretion here.

■ However, our inquiry does not end with our holding that the trial court did not err in holding the statement to be an excited utterance. Defendant's principal argument is not that the statement is not an excited utterance, but that the statement should nevertheless have been excluded under the rationale of *State v. Cruz*, 128 Ariz. 538, 627 P.2d 689 (1981). Defendant cites *Cruz* for the proposition that even hearsay which is admissible through one of the enumerated exceptions should be excluded if it "goes directly to the appellant's guilt on the charge of premeditated murder."

In *Cruz*, the defendant was charged with the murder of a fellow high school student. At trial, the defendant's sister testified. On cross-examination, she denied that she had told Rosemary Santana, the victim's girlfriend, that the defendant had told her he was going to shoot the victim. For the purpose of impeaching that denial, the state called Ms. Santana, who testified that the defendant's sister told her that the defendant "was going to shoot Leonard [the victim] and get it over with."

In *Cruz* the court stated that this testimony was not hearsay for two reasons.

The defendant's out-of-court statement was a non-hearsay admission by a party opponent. The testimony of the victim's girlfriend was impeachment testimony admissible under Ariz.R.Evid. 801(d)(1) as a prior inconsistent statement—which is also not hearsay under the Arizona Rules of Evidence.

> We went on to say, however:
>
> Yet, in the present case, we have a statement which does more than merely impeach the witnesses' statement; rather, it relates directly to the guilt of the defendant. This presents a situation where the possibility of prejudice is inordinately high and the reliability of the statement requires resolution of a swearing contest between the declarant and the person to whom the statement was allegedly made. *United States v. Cunningham*, 446 F.2d 194, 198 (2nd Cir.1971), *cert. denied*, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266. Here, the alleged statement made by Viviana Cruz [defendant's sister] was especially prejudicial due to the fact that it contained an alleged admission by the appellant which, if believed by the jury, established the appellant's guilt.

128 Ariz. at 540, 627 P.2d at 691.

We also noted in *Cruz* that *all* rules of evidence, including those favoring the admission of evidence, are counterbalanced by Rules 102 and 403.

> Rule 102 provides:
>
> These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and the promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Applying the balancing tests inherent in Rules 102 and 403 we concluded that the alleged prior inconsistent statement should have been excluded.

Unlike *Cruz*, the statement in the instant case was admitted as an excited utterance, not as a prior inconsistent statement of a witness. The excited utterance exception is based upon the settled belief that excited utterances are reliable because they are uttered spontaneously at times of great excitement or stress and without time to contemplate or fabricate. *See, e.g.*, Stephen A. Saltzburg and Kenneth R. Redden, Federal Rules of Evidence Manual 829 (4th ed. 1986) ("When a declarant makes a statement under the stress of excitement, and the statement relates to the exciting event or condition, the statement is not excluded because of the hearsay rule. It is said that spontaneity gives rise to trustworthiness"). In contrast, the prior inconsistent statement in *Cruz* carried no such indicia of reliability. Arizona's prior inconsistent statement rule, Ariz.R.Evid. 801(d)(1)(A), is a broad exception to the hearsay rule. It is based upon a belief that a jury ordinarily should be permitted to consider a prior inconsistent statement in determining credibility. It is not, however, based upon any belief or finding that the person asserting the alleged prior inconsistent statement possesses any particular badge of reliability. In contrast, Fed.R. Evid. 801(d)(1)(A) states that to be admissible in federal court the prior statement must not only be inconsistent with the present testimony but must also have been given under oath subject to the penalty of perjury at a trial, hearing, other proceeding or deposition.

In *Cruz*, the application of the balancing standards contained in Rules 102 and 403 to the proffered testimony required the exclusion of the testimony. The testimony went directly to the issue of defendant's guilt, carried no independent indicia of reliability, was offered to impeach the testimony of a non-party, and was facially admissible only because of an extremely broad exception for prior inconsistent statements.

In the instant case, the proffered testimony was an excited utterance with all the indicia of reliability which has led to the

creation of a narrow exception to the rule against hearsay. If the statement was impeaching at all (although not offered as impeachment), it was only marginally so because Masterson never denied making the excited utterance attributed to him. His testimony was that he was "not sure" he had made the statement and he also acknowledged that he had said he didn't remember the defendant saying he was going to kill the victim. In applying the balancing tests of Rules 102 and 403 to this excited utterance, the trial court was well within its discretion in admitting it. In making this determination, the trial court could consider the fact that witness Linda Bennett had already testified that she heard the defendant make the exact statement attributed to him in Masterson's excited utterance. There was no error in the admission of the statement by the witness.

### THE STATEMENT OF THE DEFENDANT

■ The second issue raised by defendant also involves the application of Ariz.R. Evid. 803(2). Defendant testified in his own defense and related his version of the incident and the events leading up to it, including his contention that the victim had threatened him with a shotgun. However, he also contends that a statement he allegedly made to the arresting officers shortly after his arrest is admissible as an excited utterance. According to defendant, he told the arresting officers that the victim had threatened him with a .12 gauge shotgun. Defendant contends that he was young, scared, and under tremendous stress and, therefore, his statement qualifies as an excited utterance. The trial court disagreed, and made the following findings:

> The Court makes a finding that the excited utterance exception to the hearsay rule does not apply under these circumstances, that the Detective testified, and I have to go back to my notes with respect to the time periods that I made a note of, that he arrived at the scene at around 10:20, that Mr. Carr was arrested approximately 30 to 40 minutes later, and these statements that were exculpatory in nature were made thereafter, appar-

> ently on the way—on the way to the Mesa Police Department.

> The Court does not find that this comes within the exception of being an excited utterance. It was on that basis that I precluded you from asking about these statements or from even asking whether or not conversation took place that would have made reference to such statements. ... I do agree with you [defense counsel], that the circumstances may change from case to case, and that some circumstances may result in excited utterances being made, even in periods of time much longer than an hour; however, the Court has to make a determination under the circumstances as to whether or not an individual making exculpatory statements had time to fabricate.

> And the Court finds under the circumstances of this case that these statements were not made in the nature of excited utterances.

As stated earlier, Rule 803(2) requires there to be a startling event, a declaration spoken soon after the event so that the declarant does not have time to fabricate, and a relation between the declaration and the startling event. Since defendant has been found to have premeditated the event, the event may have been less startling to him than it would be to a bystander or to the victim. Assuming, however, that the event was fully as startling to defendant as it was to Masterson, the trial court found that the second element was absent here. The trial court found that the defendant had time and opportunity to fabricate. Certainly he had motivation to do so.

In *State v. Rivera*, we examined the excited utterance doctrine and the stress-of-excitement requirement in particular. We noted that the time between the event and the declaration was probably the best indication of whether the declarant was still under the stress of excitement and therefore without the opportunity to engage in reflective thought. We also noted that the time element cannot be applied in a mechanical fashion in order to determine admissibility. 139 Ariz. at 411, 678 P.2d at 1375. *See State v. Barnes,* 124 Ariz. 586,

589–90, 606 P.2d 802, 805–06 (1980) ("If the totality of the circumstances indicates that the statement was made in a state of shock ... it is admissible, even though not made immediately after the event."). We also explained that the question of admissibility was left largely to the discretion of the trial court. *Rivera,* 139 Ariz. at 410, 678 P.2d at 1374.

In this case, both sides made colorable arguments to the trial court on the issue of whether the defendant's statement should be admitted as an excited utterance. The state argues that defendant not only had time for reflective thought but actively engaged in such thought:

> Here, after slashing Brent with his buck knife, appellant fled the complex. Appellant ran several blocks and then sat down by a building. After a period of time, he returned to the complex to see "what was going on." When he reached the complex and observed the fire trucks, police, and "a whole bunch of people," he concluded that he "must have messed up real bad." It was after appellant's realization that he "messed up" that the "chase" occurred and appellant was placed under arrest. It was not until appellant was on his way to jail that appellant made the statements in issue. By this time, appellant had had the opportunity to contemplate his past deeds and fashion a "story" to justify his criminal acts.

The trial court agreed with the state, and made the specific finding that the exculpatory statement was not admissible under the excited utterance doctrine because defendant had the opportunity to fabricate. The trial judge considered precisely the elements the cases required him to consider. His findings are not clearly erroneous; therefore, we affirm. *See State v. Yslas,* 139 Ariz. 60, 676 P.2d 1118 (1984); *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105, *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 79 L.Ed.2d 174 (1983).

## CONCLUSION

The trial court was correct in the two challenged evidentiary rulings. We have also reviewed the record for fundamental error pursuant to A.R.S. § 13–4035 and *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and have found none. Defendant's conviction and sentence are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.